Madden, Judge,
delivered the opinion of the court:
Plaintiff in January 1934 made two contracts, one for six and the other for ten Dolphin amphibian airplanes to be *147 manufactured by it and sold to the defendant. The defendant did not advertise for bids as required by statute[2] before making these contracts. After the airplanes had been delivered to the defendant, and after all but $89,680.54 of the contract price of $744,311.46' had been paid to plaintiff, the failure to advertise was noticed. The defendant took the view that the contracts were void and that plaintiff was entitled only to a reasonable price for the planes. The Comptroller General on the basis of an investigation and audit of plaintiff’s books and records concluded that the cost of their manufacture, which he determined to be $518,-413.77, plus a profit of ten percent, making a total of $570,255.15, was all that plaintiff should have received. This was $174,056.31 less than the contract price, and $84,-375.77 less than the amount already paid to plaintiff under the contracts. Plaintiff subsequently had other contracts with the defendant and the defendant withheld from its payments to plaintiff on these contracts the sum of $86,-169.03, to compensate itself for its claimed overpayments on the Dolphin contracts. The Comptroller General later admitted that $1,793.26 too much had been withheld and tendered that amount to plaintiff, who refused it. The cost was actually $3,692.74 more than the amount shown in the audit, or $522,106.51.
Plaintiff’s first contention is that it was entitled to the full contract price, in spite of the fact that the defendant did not advertise for bids. On that basis plaintiff would recover $175,849.57. We think that the fact that plaintiff fully performed the contracts and that the defendant paid all of the agreed price on one of them, and a large part of it on the other, does not prevent the defendant from asserting the statutory requirement. Cf. Wisconsin Central Railroad Co. v. United States, 164 U. S. 190.
Plaintiff contends, in the alternative, that if it may not recover the contract price as such, it is entitled to recover its costs incurred in the manufacture of the airplanes, plus a ten percent profit. The defendant concedes that principle. But the parties disagree as to what those costs were. The Comptroller General’s audit allowed plaintiff the actual *148 direct costs of tbe labor and materials which went into the sixteen planes, plus ten percent for profit. Plaintiff claims that the cost of these planes, properly computed, should include an appropriate part of the cost of developing the model of plane.
Only fifty-nine planes of the Dolphin model were manufactured by: plaintiff. In¡ developing a new model, the first unit is built almost entirely by hand, and at great cost. Then tools, jigs and dies for multiple production of parts are made, and workmen are trained. Not until some three shop orders or groups of planes are manufactured do the costs level off to what becomes normal for regular production. On this model, the cost of building the one plane on the first shop order was $94,199.66, the sale price was $19,981.79; on the next shop order, the corresponding average figures for each plane were $49,522.48 and $24,016.94. The immediate cost of the planes built for the defendant was $26,725.50 per plane, and the contract price was $46,519.44 per plane.
Plaintiff contends that the development cost of the model is the amount by which the costs of the early built units, before costs leveled off to normal, exceeded the normal costs. It says that the defendant should bear its proportionate share of that development cost, sixteen fifty-ninths, because it got sixteen of the fifty-nine planes of this model which plaintiff manufactured. Defendant does not deny that development costs should properly be included, but asserts that plaintiff has not shown what they were with sufficient accuracy to enable the court to fix their amount.
It is true that plaintiff, at the time it manufactured the planes in question had no systematic method of allocating certain costs and calling them, on the books, development costs. Its need for such figures in the present case results from the fault of agents of the government in not advertising for bids as the statute required. Plaintiff should not be penalized for not setting up a system of bookkeeping to meet that contingency. We should not, therefore, dismiss plaintiff’s claim because of indefiniteness of proof unless the proof is really so indefinite as to make an intelligent judgment impossible. We think it is not so here.
*149 Comparison of the costs of the first made units with those of the units made after normal production was reached would give us the development costs, if other conditions remained unchanged. The defendant says that other conditions did not remain unchanged. It points to the price of aluminum and of labor. As to labor, we find that the only material changes in wage rates between 1929, when the first plane of this model was begun, and 1935, when a normal level of costs had been reached, were increases in 1933 and 1934 or 1935. That change operates in favor of the defendant, since it keeps down the early cost, increases the later cost, and thus reduces the difference between them, which plaintiff claims as the development cost. The price of aluminum, however, did go down from $24.30 per hundred pounds in January 1930 to $20.50 in December 1934. That change would tend to make plaintiff’s method of ascertaining development costs inaccurate. Plaintiff offers, in its brief, a method of eliminating this inaccuracy. Its suggestion is as follows: the $24.30 cost of aluminum for the early made planes exceeded the weighted average cost of $21.86 for aluminum used in planes manufactured after production became normal by approximately 10%; assume that the price of all materials used in the planes fell 10% between the time of making the first planes and the later ones; take 10% of the cost of all materials used in the early series, $179,016.47; the result is $17,901.65; deduct the $17,901.65 from $211,412.84, the amount of the development cost if fluctuations in prices were disregarded; this gives $193,-511.19 as the corrected development costs; take 16/59 of that amount, or $52,477.60, as the defendant’s proportionate part; add overhead adjusted to this reduced figure in the amount of $2,193.60, giving an adjusted figure for the defendant’s share of the development costs of $54,671.20.
We think this method of computation is acceptable, with one minor exception,[3] in the absence of better available proof. It does not substantially prejudice the defendant unless the cost of some important material, other than *150 aluminum, fluctuated downward more than ten percent during tbe period here in question. We think that if that had occurred, the defendant would at least have raised the question as to that particular material. In a situation such as this, where the confusion has been caused by the fault of the defendant, we think it may not stand completely aloof and take no responsibility for assisting in resolving the difficulty.
During the course of shop order 340, which carried the defendant’s contracts, the defendant requested certain changes in the tail structure, or empennage, of the Dolphin, to facilitate landing in rough water. Shop order 380, for nine commercial planes for another purchaser, was progressing through plaintiff’s plant concurrently with shop order 340, and as the first plane in shop order 380 was in a more advanced stage of construction than any of the planes on shop order 340, the redesigning and experimental work on the empennage was largely carried out on it. The development cost was carried on that shop order and none of it was allocated to shop order 340. Plaintiff proposes to allocate that cost by adding the total empennage costs on the two shop orders and dividing by the number of planes so as to make each plane in the two shop orders bear an equal amount of that cost. Since all the planes under the two orders were substantially similar, we think that method of computation is permissible, under the circumstances of this case. The empennage costs on both shop orders totalled $294,189.89. Allocating this amount proportionately to the number of planes in each group increases the cost of shop order 340 by $27,782.50.
We conclude, therefore, that plaintiff should have been paid development costs in the amounts of $54,683.46 and $27,782.50 in addition to the direct costs. It should have been paid a total of $665,029.72 (costs plus 10%). It was paid $654,630.92 on these contracts and the defendant is withholding from it on other contracts the sum of $86,-169.03. It may therefore recover $96,567.83.
It is so ordered.
JoNes, Judge; Whitaker, Judge; LittletoN, Judge; and Whaley, Chief Justice, concur.

 United States Code, tit. 41, see. 5.

 Our computation of the adjusted overhead is $2,205.86:
($2,409.92 — 2, 409.92) instead of $2,193.60.