### DEPARTMENT OF WATER AND POWER OF CITY OF LOS ANGELES et al. v. UNITED STATES.

No. 43727.

Court of Claims.

Nov. 5, 1945.

Plaintiffs sue to recover $11,174.63 alleged to be due as a result of certain contracts with defendant for water purchased from plaintiffs by defendant and used by it at two veterans' hospitals, one of which is known as the San Fernando and the other as the Sawtelle.

Recovery is grounded on the claim that the water was used outside the city limits of Los Angeles and that the ordinance rate for water so used was higher per 100 cubic feet than the within-city rate provided in the contracts and paid by defendant. The difference between the higher or outside-city rate and the within-city rate is claimed after November 1, 1931, to September 6, 1933, as to the San Fernando Hospital, and from November 1, 1931, to January 1, 1932, as to the Sawtelle Hospital.

The principal contentions made by defendant are that the within-city rate, which had been agreed to, charged, and paid long prior to November 1, 1931, for the water obtained from plaintiffs and used at the hospitals, was the proper and legal rate during that period and the periods here involved; but that if, in the circumstances, this was not the proper and legal rate, plaintiffs at no time had a contract expressed or implied in fact for a higher rate and this court is without jurisdiction of the claim.

### Special Findings of Fact

#### San Fernando Hospital

1. In the early 1920's it became desirable for the United States, through the Veterans' Bureau, to construct an additional hospital in Southern California for the treatment of tuberculosis patients. Several sites were considered, among which was one containing 616.02 acres and known as the Ford Craig property or Loop Ranch. Thirteen and one-half acres of this tract were within the corporate limits of the City of Los Angeles and the remaining 602.52 acres were outside but adjacent to said limits.

2. During 1923, 1924, and 1925, several conferences were held between representatives of the Veterans' Bureau and representatives of the city and of the Board of Public Service Commissioners of Los Angeles, predecessor of the Board of Water and Power Commissioners of Los Angeles, relative to the possible purchase of the site by the United States and the furnishing of water to it by the City of Los Angeles, and the representatives of the Veterans' Bureau were assured that the City of Los Angeles would furnish the water and at the lower rate charged patrons within the city limits instead of at the higher rate charged patrons outside the city limits. These conferences were mostly with Mr. William Mulholland, the engineer of the Board, whose recommendations to the Board were always followed, but other city officials, including the city attorney, were in some of the conferences.

3. The United States purchased the site and constructed the hospital, referred to as the San Fernando Hospital, the construction of the hospital being completed in the spring of 1926.

4. The Board of Water and Power Commissioners of the City of Los Angeles, by an indenture dated January 6, 1926, conveyed to the United States an easement in a plot of land, approximately 50' x 50' at the corner of Eldridge Street and Astoria Avenue, for the construction and operation thereon by the United States at its own expense of a pumping station, and also an easement across the land between this plot and the Maclay or Pacoima Reservoir, owned by the city, a distance of about 150 feet, for the laying by the United States at its own expense of a 10-inch suction pipe line from the pumping station to the reservoir. Both the plot and the reservoir were within the city limits.

5. On January 9, 1926, a written agreement was entered into between the Department of Water and Power of the City of Los Angeles and the United States covering the construction by the city of an 8-inch pipe line along Astoria Avenue from defendant's pumping station to the corporate limits of Los Angeles nearest the hospital site, a distance of about a half mile, the United States to pay for it at a certain rate per month during a period of five years, at the expiration of which time title to the pipe line should be and remain in the City of Los Angeles.

6. The United States, at its own expense, constructed a pumping station on the plot of land mentioned in finding 4, and also at its own expense laid a 10-inch suction pipe line from it to the reservoir, installing thereon a meter for the measur-

ing of the water going into the pumping station from the reservoir.

The Government paid the city a total of $4,315.67 for the construction to the city limits of the 8-inch pipe line referred to in the January 9, 1926, agreement described in finding 5, after first, however, acquiring a right-of-way a distance of 178.1 feet from the end of Astoria Avenue to the corporate limits of the city, inasmuch as Astoria Avenue actually did not extend to the city limits, as set forth in said agreement, and at said city limits said pipe line connected with the hospital's own pipe system built by it on its own grounds. This work was actually done prior to the dates stated in findings 4 and 5 but pursuant to agreements arrived at in the conferences set out in finding 2.

The United States bore the expense of operating the pumping station and, since the meter was between the pumping station and the reservoir, it bore all the expense of any line loss or leakage of water that might occur in the line after the water left the meter. The pumping station was necessary because the hospital site and grounds were higher than the Pacoima Reservoir.

7. In October 1925, the first written contract for the furnishing of water was entered into between the city and the Veterans' Bureau. It covered the period from November 1, 1925 to June 30, 1926. It provided that the water would be furnished "at combined irrigation and domestic rate at five (5) cents per 100 cubic feet and in addition thereto, a monthly service charge of $1.00, subject however to change of rates by resolution of Board of Water and Power Commissioners and ordinance adopted by the Council of the City of Los Angeles." It also provided that:

"Delivery of water to be made at Reservoir of Department of Water and Power, said reservoir located south of Eldridge Street, between Sayre and Astoria Avenues, Los Angeles, California, officially known as the Pacoima Reservoir."

On May 27, 1926, a second written contract was entered into under and by which the city agreed to furnish water during the period from July 1, 1926 to June 30, 1927, "at combined irrigation and domestic rate of five (5) cents per 100 cubic feet and, in addition thereto, a monthly service charge of $1.50, subject however to change of rates by resolution of Board of Water

and Power Commissioners and ordinance adopted by the Council of the City of Los Angeles." This contract also provided that:

"Delivery of water to be made at Reservoir of Department of Water and Power, said reservoir located south of Eldridge Street, between Sayre and Astoria Avenues, Los Angeles, California, officially known as the Pacoima Reservoir.

"The rates specified herein are not in excess of those charged the general public for similar service and are subject to any changes made by a duly authorized State or Government commission during the period of the contract."

This contract further provided that it should remain in force during the period stated unless terminated at the request of either party after ninety days' notice in writing.

A third contract similar to the first two was executed December 24, 1926, covering the period from July 1, 1927 to June 30, 1928, and on December 12, 1927, another contract, similar to the others, was executed covering the period from July 1, 1928 to June 30, 1929. All four of these contracts were in accord with the then existing within-city ordinance rates.

8. A fifth contract was entered into November 27, 1928, covering the period from July 1, 1929 to June 30, 1930. This contract contained the following provision:

"At the option of the Government, this contract may be renewed from year to year for a period of five years after the commencement date as shown on page one, upon notice in writing to the contractor at least thirty (30) days prior to the expiration date, unless previously canceled in accordance with clause two hereof."

Clause two was the same provision that was in the former contracts, i. e., that the contract should remain in force during the period stated therein unless terminated at the request of either party after ninety days' notice in writing. The contract also contained the following:

"At combined irrigation and domestic rate a minimum charge of $2.45 per month will be made for monthly consumption of 1900 cubic feet or less and for all consumption in excess of 1900 cubic feet a charge will be made of 5 cents for 100 cubic feet, subject, however, to change of rates by resolution of Board of Water

and Power Commissioners and ordinance adopted by the Council of the City of Los Angeles.

"Delivery of water to be made at Reservoir of Department of Water and Power, said reservoir located south of Eldredge Street, between Sayre and Astoria Avenues, Los Angeles, California, officially known as the Pacoima Reservoir.

"The rates specified herein are not in excess of those charged the general public for similar service and are subject to any changes made by a duly authorized State or Government Commission during the period of the contract.

"Ten-inch meter on service."

The rates fixed in this contract were also in accord with the then existing ordinance governing within-city rates.

9. All the contracts were executed on behalf of the city by the Comptroller, Mr. L. M. Anderson, pursuant to a resolution adopted by the Board of Public Service Commissioners of the city on August 15, 1919, as follows:

"Whereas, the United States Government requirements make it necessary for this Department to enter into contract each time water is applied for by the several branches of the United States Government, and it will cause delay if the Board of Public Service Commissioners acts on each application separately;

"Now, therefore, be it resolved, that the Comptroller be, and he is hereby, authorized to enter into contracts on behalf of this Board for furnishing water or light and power to the several Departments of the United States Government, at ordinance rates; and that he be authorized to sign said contracts for and on behalf of this Board."

10. Plaintiffs furnished and the defendant paid for water at the rate fixed by the contract of November 27, 1928, the then existing within-city ordinance rate, until about November 1, 1931, the contract of November 27, 1928 having been renewed from year to year, at which time (November 1, 1931) the plaintiffs made the contention that the higher ordinance rate outside the corporate limits should govern and that the defendant should pay at that rate.

11. On December 1, 1931, the plaintiffs began billing the defendant for water at the higher without-city ordinance rate. The defendant refused to pay at the increased rate. Nevertheless plaintiffs continued furnishing water under renewals of the contract of November 27, 1928 until they cancelled this contract by 90 days' written notice, effective September 6, 1933. Thereafter other arrangements for the furnishing of water were made which are not involved in this suit or other controversy. The following table shows the cubic feet of water furnished during the period in question, the amounts billed for it by plaintiffs at the without-city ordinance rates, the amounts paid for it by the defendant at the contract or within-city rates, and the amounts unpaid at the without-city ordinance rates:

| Month | Water, cu. ft. | Am't of bill | Am't paid | Balance |
|---|---|---|---|---|
| Nov. 1-31, 1931, incl.. | 331,600 | $663.20 | $165.80 | $497.40 |
| Dec. 1-31, 1931, incl.. | 245,100 | 490.20 | 122.55 | 367.65 |
| Jan. 1-31, 1932, incl.. | 253,700 | 209.59 | 126.85 | 82.74 |
| Feb. 1-29, 1932, incl... | 207,700 | 177.39 | 103.85 | 73.54 |
| Mar. 1-31, 1932, incl.. | 303.000 | 244.10 | 153.15 | 90.95 |
| Apr. 1-30, 1932, incl... | 416,200 | 323.34 | 209.60 | 113.74 |
| May 1-31, 1932, incl... | 372,000 | 292.40 | 187.50 | 104.90 |
| June 1-30, 1932, incl.. | 627,800 | 471.46 | 315.40 | 156.06 |
| July 1-31, 1932, incl.. | 549,800 | 416.86 | 276.40 | 140.46 |
| Aug. 1-31, 1932, incl.. | 632.800 | 474.96 | 317.90 | 157.06 |
| Sept. 1-30, 1932, incl.. | 565,200 | 427.64 | 284.10 | 143.54 |
| Oct. 1-31, 1932, incl... | 408,000 | 317.60 | 205.50 | 112.10 |
| Nov. 1-30, 1932, incl.. | 427,400 | 331.18 | 215.20 | 115.98 |
| Dec. 1-31, 1932, incl... | 218,600 | 185.02 | 110.80 | 74.22 |
| Jan. 1-31, 1933, incl... | 222,900 | 188.03 | 112.95 | 75.08 |
| Feb. 1-28, 1933, incl... | 186,000 | 162.20 | 94.50 | 67.70 |
| Mar. 1-31, 1933, incl.. | 269,000 | 220.30 | 136.00 | 84.30 |
| Apr. 1-29, 1933, incl... | 299,400 | 241.58 | 151.20 | 90.38 |
| Apr. 30-May 31, 1933, incl. ............... | 339,900 | 269.93 | 171.45 | 98.48 |
| June 1-30, 1933, incl.. | 421,000 | 326.70 | 212.00 | 114.70 |
| July 1-31, 1933, incl.. | 547,600 | 415.32 | 275.30 | 140.02 |
| Aug. 1-31, 1933, incl.. | 553,000 | 419.10 | 278.00 | 141.10 |
| Sept. 1-29, 1933, incl.. | 382,100 | 299.47 | 278.09 | 21.38 |
| Totals ........... | ........ | 7,567.57 | 4,504.09 | 3,063.48 |

12. Plaintiffs filed a claim with the Comptroller General of the United States but on September 17, 1932, he ruled that the defendant was not required to pay at the without-city ordinance rate. On October 11, 1932, plaintiffs requested of the Comptroller General a review of his decision but on November 17, 1932, he affirmed his previous decision.

Plaintiffs filed claims with the Veterans' Administration November 8, 1935, but the same were rejected. Then, on May 21, 1930, plaintiffs in writing again requested of the Comptroller General a review and allowance of plaintiffs' claim but on August 7, 1936, he denied plaintiffs' request.

There was an agreement between plaintiffs and the Veterans' Administration that plaintiffs' acceptance of the amounts paid by the defendant should not prejudice plaintiffs' right to recover the entire amount claimed.

13. The Charter of the City of Los Angeles contains the following provisions:

"The Department of Water and Power shall have the power and duty:

"(1) To construct, operate, maintain, extend, manage, and control works and property for the purpose of supplying the city and its inhabitants with water and electric energy, or either, and to acquire and take, by purchase, lease, condemnation, or otherwise, and to hold, in the name of the city, any and all property situated within or without the city, and within or without the state, that may be necessary or convenient for such purpose.

"(2) To regulate and control the use, sale and distribution of water and electric energy owned or controlled by the city; the collection of water and electric rates, and the granting of permits for connections with said water or electric works; and to fix the rates to be charged for such connections; and, subject to the approval of the Council by ordinance, to fix the rates to be charged for water or electric energy for use within or without the city, and to prescribe the time and the manner of payment of the same. Such rates shall be so fixed at least every two years; provided that, except as hereinafter otherwise prescribed, such rates shall be of uniform operation, as near as may be, and shall be fair and reasonable, taking into consideration, among other things, the nature of the use, the quantity supplied, and the value of the service; provided, further, that the rates inside the city may be less, but not greater, than the rates outside the city for the same or similar uses.

"(3) To supply and distribute, at rates fixed as hereinbefore provided, any surplus water or surplus electric energy, owned or controlled by the city and not required for the use of consumers served by the city within its limits, to consumers outside the city for their own use, and to municipal corporations outside the city for municipal uses, or for resale, disposal, or distribution, to consumers within their limits: Provided, That the supplying or distribution of such surplus water or surplus electric energy shall, in any case, be subject to the paramount right of the city, at any time, to discontinue the same in whole or in part, and to take and hold, or to distribute, such surplus water or surplus electric energy for the use of the city and its inhabitants: Provided, further, That contracts for supplying surplus water or surplus electric energy by the city to municipal corporations outside the city, or for interchange of surplus water or surplus electric energy with any such outside municipal corporations, may be made by the Board of Water and Power Commissioners in the name of the city for periods not exceeding fifteen years, and upon such terms and conditions, and for such compensation to the city, as shall be prescribed by resolution adopted by the board and approved by an ordinance of the city; but in every such contract the right shall be reserved to the city to terminate the same upon three years' written notice to such municipal corporation, to be given by said board whenever it shall be determined and declared by resolution adopted by the board and approved by an ordinance of said city that the water or electric energy to be supplied under such contract is required for the City of Los Angeles and its inhabitants; and every such contract must, before the execution thereof, be assented to by the majority of the qualified electors of said city voting upon the proposition at a general or special election at which such proposition shall be submitted."

14. The ordinances fixing the without-city rates provided that "when water is supplied * * * to consumers outside the limits of the City of Los Angeles the rates to be charged and collected * * * are fixed as follows: * * *." The ordinances fixing the within-city rates provided that for "water supplied * * * to consumers inside the limits of the City of Los Angeles the rates to be charged and collected * * * are fixed as follows: * * *." The without-city rates were considerably higher than the within-city rates.

15. The buildings on the hospital grounds were all on the 602.52 acres without the city limits. To obtain the site defendant had to buy more land than it actually needed, a part of the site being a mountainside, but about 40 acres were devoted to the growing of grapes, about two acres to grapefruit, and about five acres to lemons and oranges. There were also fig and olive trees on the site and

some vegetables were raised. Citrus fruit is an important part of the diet of the hospital patients, and if vegetables had not been raised they would have had to be purchased by the hospital. The 13½ acres within the city limits were first covered with Bermuda grass, but this was found to be too expensive to keep up, and the grass was taken up and about 2,000 trees were put out in its place. The purpose in planting the trees was to keep up the reforestation of the site, to prevent brush from growing and constituting a fire hazard, to temper the air in the summertime, as there was reflection from the 13½ acres to the buildings, and to prevent soil erosion. The water obtained from the city was used for drinking and other purposes in the hospital and buildings and to water the site generally, including the things growing on it.

16. There was no mistake of fact in the execution of the water contracts at the five-cent or within-city rate. Until November 1, 1931, all the representatives and officials of the city who had a part in the transactions were of the opinion that because 13½ acres were within the city limits and because of the facts and circumstances under which the water was to be furnished the five-cent or within-city rate could be used. Whatever mistake there was, if any, was purely one of law.

### Sawtelle Hospital

17. The hospital operated by the Veterans' Administration, spoken of as the Sawtelle Hospital, was constructed prior to 1920.

At that time, however, the hospital was one of the Soldiers' Homes operated by and under the jurisdiction of the Board of Managers of the National Home for Disabled Volunteer Soldiers, being called the Pacific Branch of said Home. It is on a site containing 624.65 acres which is surrounded by the City of Los Angeles but is not legally within the corporate limits of the city. There are two main hospital buildings and several related buildings on the site.

18. In 1920, the city desired to obtain a right-of-way across the site of the Sawtelle Hospital for the construction and maintenance of a pipe line for conveying water for distribution in the portion of the city known as Westgate. After conferences between representatives of the city and of the hospital, the hospital offered to convey to the city the right-of-way on condition that the city would permit service connections to be made for taking water from the pipe line for domestic use of the hospital and irrigation of the site and at rates and in accordance with the rules and regulations prescribed and fixed in pursuance of the Charter of the City, meaning at the within-city ordinance rates.

19. The offer of the hospital was accepted and agreed to by the city and on December 29, 1920, the hospital conveyed to the city a permanent easement over the site upon condition that the service connections would be made and the water furnished.

20. The city constructed the pipe line, a 24-inch trunk line, across the site; the service connections were made for the hospital and grounds, and from December 1920 to March 7, 1929, the city furnished water to the Sawtelle Hospital at the within-city rate without any formal written contract.

21. On March 7, 1929, the first formal written contract was entered into covering the period from February 25 to June 30, 1929, for an estimated requirement of 8,000,000 cubic feet of water at rates in accord with the within-city ordinance rates. This contract also provided that if the price fixed by the city for like water service in adjacent within-city locations should fall below the rates therein stipulated then such prices should form the basis for payment to take effect as soon as such reduced prices should become effective in such adjacent locations. The contract also provided that the hospital could renew it annually by giving notice 60 days prior to expiration of the contract and each renewal thereof.

22. On May 25, 1929, May 22, 1930, and May 22, 1931, new contracts were entered into similar to the one of March 7, 1929, each one being considered by the parties as a renewal of previous ones, and all in accordance with the then existing within-city ordinance rates. These contracts were for estimated requirements of 30,000,000, 40,762,666, and 41,333,334 cubic feet of water. The last mentioned contract was the first entered into by defendant through the Veterans' Administration, all the previous contracts having been executed by the National Home for Disabled Volunteer Soldiers.

23. Adjacent property owners paid the within-city ordinance rates as their properties were within the corporate limits.

24. On November 1, 1931, the city began billing the Sawtelle Hospital at the higher without-city ordinance rates, which the hospital refused to pay.

25. The bills for the months of November and December ·1931 at the without-city rate amounted to a total of $12,577.00, of which the hospital paid, at the contract or within-city rate, a total of $4,465.85, leaving a balance of $8,111.15. After January 1, 1932, other arrangements for the furnishing of water were made which are not involved in this suit or other controversy.

26. November 8, 1935, plaintiffs filed with the Veterans' Bureau Administration their claim in the amount of $8,111.15, and the same was rejected.

May 21, 1936, plaintiffs filed a claim in writing with the Comptroller General who, on August 7, 1936, advised plaintiffs that he was seeking additional information from the Veterans' Administration and that when he received it the claim would be given further consideration. On November 19, 1936, plaintiffs wrote to the Comptroller General giving further details, and on March 23, 1937, the Comptroller General wrote plaintiffs a letter denying the claim. There was an agreement between plaintiffs and the Veterans' Administration that the acceptance of the $4,465.85 by plaintiffs should not prejudice their right to recover the $8,111.15.

27. There was no mistake of fact in the execution of the contracts and in the furnishing of water at the within-city rates. It was the intention and agreement of the parties from the beginning in 1920 that this be done and they were of the opinion that under the facts and circumstances the within-city rates could be used. Whatever mistake there was, if any, was purely one of law.

Philip M. Fairbanks, of Washington, D. C. (Ray L. Chesebro, City Atty., S. B. Robinson, Chief Asst. City Atty., and John H. Mathews, Deputy City Atty., all of Los Angeles, Cal., on the brief), for plaintiff.

S. R. Gamer, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

The rate for each 100 cu. ft. of water obtained from plaintiffs by defendant and used by it for and in connection with its two veterans' hospitals, as set forth in the findings, was the within-city ordinance rate as provided in certain written contracts made pursuant to and in accordance with certain prior arrangements and agreements, but plaintiffs contend that under the provisions of the City Charter and existing ordinances the higher outside-city rate was applicable, because the within-city rate so agreed upon was not expressly approved by the City Council.

During the period from October 1925 to November 1, 1931, during which an original and several renewal contracts relating to the San Fernando Hospital were made, the within-city water rate of 5 cents per 100 cu. ft., provided in such contracts, was billed by plaintiffs without any question or objection with reference thereto, and was paid by defendant. During the period November 1, 1931 to September 6, 1933, the effective date of a contract termination notice given by plaintiffs, water was furnished to this hospital under the same contracts and under the same circumstances, and was billed at the higher without-city rate of 20 cents per 100 cu. ft., but defendant paid therefor at the lower within-city contract rate under renewals by defendant of the contract of November 27, 1928, under a renewal option given it therein. Each of the contracts and renewals made on and after May 27, 1926 contained a provision that either party might terminate it on ninety days' notice. Plaintiffs did not exercise this right until about June 8, 1933.

From December 1920 to March 7, 1929, plaintiffs furnished defendant water at the within-city rate for the Sawtelle Hospital under an agreement with defendant but without a written contract, and thereafter water was so furnished without question until November 1, 1931, under an original and annual renewal contracts, the last one of which extended to June 30, 1932. The controversy as to the water rate for this hospital continued from November 1, 1931 to January 1, 1932, when other arrangements, not here involved, were made by the parties.

The Sawtelle Hospital land and buildings, although not legally within the city limits, because it was a Government reservation, were wholly within the area encompassed by the outer boundaries of the corporate limits of the city.

The basis of the claim for $11,174.63 made by plaintiffs, representing the difference between the ordinance rate for water used outside the city limits and the rate for water used within the city limits, is the alleged erroneous and illegal application of rates for water which was supplied under contracts to the two institutions for uses which it is alleged were in both instances, outside the city, in which contracts the within-city rate was provided.

Plaintiffs contend that in the light of the fact that rates had been established by ordinance, as prescribed by the City Charter, for both within-city and outside-city uses, the executed contracts insofar as they provided for within-city rates for without-city uses were unlawful, discriminatory, ultra vires, and not binding on plaintiffs. They state their position herein to be that the Government purchased water under contracts for uses outside the city; that the Charter of the City of Los Angeles placed the duty and the power upon the Department of Water and Power to fix rates for such use; that rates were so fixed but, by mistake, the rates applicable to uses within the city were applied; that after plaintiffs discovered the mistake the water delivered to the two Federal institutions was billed for at the proper outside-city rate, and that it would have been illegal and improper for plaintiffs to have done otherwise, notwithstanding the existing contracts at a different rate.

The San Fernando Hospital buildings and a portion of the land of the site thereof were outside the city limits, but a portion of the land (13½ acres out of 616.02 acres) and a pumping plant and a certain portion of the pipe lines constructed or paid for by defendant from the hospital buildings to plaintiffs' reservoir were within the city limits.

We are of opinion on the facts and circumstances of the case that plaintiffs are not entitled to recover.

The Charter of the City of Los Angeles (finding 13) with respect to the Department of Water and Power provided as to water, so far as here material, that this Department "shall have the power and duty: (1) To construct, operate, maintain, extend, manage and control works and property for the purpose of supplying the city and its inhabitants with water, * * *. (2) To regulate and control the use, sale and distribution of water owned or controlled by the city; the collection of water rates, and the granting of permits for connections with said water works; * * * and, subject to the approval of the Council by ordinance, to fix the rates to be charged for water for use within or without the city * * *. Such rates shall be fixed at least every two years; provided that, except as hereinafter otherwise prescribed, such rates shall be of uniform operation, as near as may be, and shall be fair and reasonable, taking into consideration, among other things, the nature of the use, the quantity supplied, and the value of the service; provided further, that the rates inside the City may be less, but not greater, than the rates outside the City for the same or similar uses."

The pertinent portions of the ordinances of the City Council (finding 14) approving within-city water rates fixed by resolutions of the Department of Water and Power provided that for "water supplied * * * to consumers inside the limits of the City of Los Angeles the rates to be charged and collected * * * are as follows: * * *." The ordinances approving without-city rates so fixed provided that "When water is supplied * * * to consumers outside the limits of the City * * * the rates to be charged and collected * * * are fixed as follows: * * *."

In the petition plaintiffs alleged as one of the grounds for recovery that the water contracts at the within-city rate of five cents per 100 cubic feet of water were entered into as a result of a mutual mistake of fact and should, therefore, be reformed. But there clearly was no mutual mistake of fact (findings 16 and 27), and plaintiffs have apparently abandoned this ground since no mention of it is made in their briefs.

As to the other ground on which recovery of the higher outside-city water rate is sought, namely, the erroneous and illegal application in the contracts between the parties of the within-city rate for water furnished defendant for consump-

946

tion outside the city limits at the San Fernando Hospital, we agree with the defendant that this asserted illegality disappears when the City Charter, the ordinances, and the special and peculiar circumstances of the instant case are analyzed.

After a thorough investigation by defendant, acting through officials of the Veterans' Bureau, in 1923, 1924, and 1925, as to the advisability of purchasing a site and erecting thereon a hospital near Los Angeles for disabled veterans, and after many conferences by these officials and official representatives of plaintiffs, the plaintiffs and the Veterans' Bureau agreed that plaintiffs would furnish water, in the manner presently detailed, to a hospital proposed to be located upon a site, the purchase of which by defendant was then under consideration, at rates applicable under city ordinances to consumers located within the city limits. After the agreement mentioned had been reached, defendant purchased the site and the construction of the San Fernando Hospital thereon was completed in the spring of 1926. The buildings of the hospital proper were all outside the city limits, but a portion of the site, on which water was also used, and certain facilities of the hospital, consisting of a pumping plant and water pipe line, were located within the city limits. The plan worked out and agreed to between plaintiffs and the Veterans' Bureau for the obtaining by defendant and the furnishing by plaintiffs of water at within-city rates for the proposed hospital, was as follows:

The City of Los Angeles had a reservoir which was located approximately ½ mile within the city limits nearest to the hospital site. Due to the fact, which everyone knew, that it would be necessary to construct a pumping plant in order to get water to the hospital because the hospital site and grounds were higher than the city's reservoir, it was agreed that the city would convey to defendant an easement in a plot of land approximately 50′ x 50′ located about 150 feet from the reservoir, and that, on this plot, defendant would at its own expense construct and operate a pumping plant and a 10-inch suction pipe line from the pumping plant to the reservoir over an easement, also to be granted and conveyed by the City.

It was further agreed that there would be constructed by the city from defendant's pumping station to the corporate limits of the city nearest the hospital site, a distance of ½ mile, an 8-inch pipe line through which water pumped by defendant from the reservoir would be conveyed by the pumping plant to the hospital, the balance of this pipe line from the city limits to the hospital being furnished and constructed by defendant. It was also agreed that the entire cost and expense to the city of constructing this ½ mile of pipe line within the city limits would be assumed by defendant and reimbursed to the city by it, although title to this portion of the pipe line was to be in and belong to the city. The defendant paid $4,315.67 to the city for this section of the pipe line. It was also agreed that the meter for measuring the water sold by the city and used by defendant was to be furnished and installed by defendant at the pumping plant.

The conferences at which this plant and arrangement were worked out and agreed to by plaintiffs were for the most part with William Mulholland, the engineer of the Department of Water and Power, whose recommendations to that Department were always followed, but other officials of the City of Los Angeles, including the City Attorney, participated in some of the conferences with reference to the arrangements to furnish defendant with water at the within-city rate. There is evidence that various members of the City Council also participated in some of these conferences. The City Council was, at least from early in 1925, familiar with the plan and the arrangement between the parties. It was originally proposed and agreed that plaintiffs would grant defendant a license or permit and that defendant would furnish and construct over the city's streets the ½ mile of 8-inch pipe line, above mentioned, from the pumping station to the city limits, along with the construction of the remainder of the pipe line to the hospital. Some question arose within plaintiffs' organizations as to the propriety or legality of plaintiffs granting defendant a license or permit to carry out such pipe-line construction work over the city's streets, and the matter was brought to the attention of the City Council. After consideration the Council, at a meeting on July 13, 1925, requested plaintiffs to grant defendant the permit. The Department of Water and Power granted the permit on the following day. This grant was subsequently considered to be ineffective and the arrangement hereinbefore set

forth, under which plaintiffs constructed this section of the pipe line at defendant's expense, was agreed to.

◾ The above described plan and arrangement for the sale of water to defendant at plaintiffs' reservoir at 5 cents per 100 cu. ft., were fully understood, agreed to, and consummated by written contracts. The first written contract was executed in October 1925. There was no fraud, mistake, or concealment on the part of anyone. Plaintiffs obviously considered and it is clear that they believed, at least from 1923 until November 1931, that under the broad powers granted to the Department of Water and Power by the City Charter and under the existing ordinances of the City Council it was proper and legal in the circumstances for the Board of Water and Power Commissioners to make the special arrangement which was made with defendant and to enter into the contracts in question to sell water to defendant at the city reservoir at the within-city rate of 5 cents per 100 cubic feet, rather than to charge for water so obtained the outside-city rate of 20 cents per 100 cubic feet based, as this last-mentioned rate was, upon facilities and services constructed, maintained, and supplied by the city. In this we think plaintiffs were right, and that the Board acted within the scope of its power and authority under the City Charter and under the Ordinances. Plaintiffs simply sold defendant water at the reservoir and "supplied" and "furnished" it within the city. In the circumstances the fact that this water, or most of it, was to be conveyed and used by defendant outside the city is not controlling and did not, in our opinion, render the plan agreed to and the contracts made pursuant thereto unauthorized or illegal.

◾ As to the contention that the arrangement and the contracts made for the within-city rate were illegal and ultra vires, because they were not expressly approved by ordinances of the City Council, we think such express approval of the within-city ordinance rate agreed to was not necessary in the circumstances. However that may be, there is enough in the record to support the conclusion that the Council was fully aware of what was being done and the reasons therefor. It expressly acquiesced on two occasions, in February 1925 and January 1926, in the arrangements by which defendant was to obtain water, and we think the circumstances are sufficient to show that it impliedly acquiesced in and agreed to the use of the within-city rate which was an important and integral part of this arrangement.

On February 11, 1925, the Council adopted an ordinance which was approved by the Mayor February 16, 1925, authorizing the granting by deed of an easement on and over the plot of land near the reservoir for the construction and operation by defendant of a pumping station and pipe line connection to the reservoir "for pumping and filtration purposes." At that time the Council must have known of the entire arrangement under which neither the City nor the Department of Water and Power was to furnish or supply any facilities or services for "furnishing" or "supplying water" outside the city limits. Under the plan and arrangements agreed to and the contracts made pursuant thereto, plaintiffs, as above stated, simply sold water within the city to defendant at the within-city ordinance rate, and it seems clear that everyone understood that this was what was being done. The parties proposed and agreed that defendant would go to the reservoir and get the water needed by it and convey it at its own cost and expense by proper means to its hospital and grounds for use both within and without the city. In effect there was a within-city sale of a commodity rather than the furnishing of the usual water facilities and services to an outside consumer. There is evidence that the ultimate cost to defendant of the water so obtained for the San Fernando Hospital was from 7½ to 18 cents per 100 cubic feet.

Plaintiffs contend that the proper interpretation of the City Charter and the Ordinances in effect when the original plan and subsequent contracts were agreed to, is that the place of use of water, rather than the point of sale and delivery, must be the determining factor as to whether the within-city or without-city rate is applicable, but we think this contention overemphasizes the word "use" and leaves out of consideration the peculiar and special nature of the transaction, which, as we have said, was within the power and authority of the Department of Water and Power to conclude and carry out under the existing ordinances and the broad powers granted by the Charter. Moreover, part of the water, and probably a con-

948

siderable part, purchased by defendant was actually used within the City. Plaintiffs make no allowance for this.

In the circumstances of this case we think the classification of defendant as a within-city consumer was within the power of the Board of Water and Power Commissioners, and that it was proper.

Plaintiffs are therefore not entitled to recover the amount of $3,063.48 claimed with respect to water sold to the San Fernando Hospital.

For water sold to defendant for use at the Sawtelle Hospital, plaintiffs and defendant agreed upon the within-city rate which was billed and paid without question from 1920 to November 1, 1931. On November 1, 1931, and until January 1, 1932, plaintiffs claimed and billed defendant as for water furnished outside the city at 20 cents per 100 cubic feet, which defendant refused to pay and $8,111.15 is claimed on this account.

The facts with reference to this claim are set forth in findings 17 to 27. This hospital was constructed prior to 1920 on a site purchased and owned by defendant containing 624.65 acres. This hospital and grounds are within the outer boundaries of the city but the site is not legally a part of or within the corporate limits of the city. It is for this last-mentioned reason that plaintiffs claim this hospital was an outside consumer and chargeable with the outside-city ordinance rate.

In 1920 the City of Los Angeles desired to obtain from defendant a right-of-way across the hospital grounds for the construction and maintenance of a pipe line for conveying water from its reservoir for distribution to consumers located in the portion of the city known as Westgate. The officials of the hospital representing defendant proposed that defendant would convey the desired right-of-way to plaintiffs on the condition that the city permit defendant to obtain water service at the within-city rate through connections with the proposed water main, or pipe line. Conferences and negotiations were had between authorized representatives of the parties as a result of which defendant's offer was accepted by the city. The agreement was consummated and carried out. Defendant conveyed a permanent easement over the hospital grounds on December 29, 1920, on the condition that the service connections would be made and water fur-

nished in accordance with the above-mentioned agreement of the parties. Plaintiffs constructed a 24-inch trunk pipe line across the grounds; made service connections therewith and furnished the hospital water at the within-city rate until a question as to the propriety and legality of this arrangement was raised by plaintiffs in November 1931. During the period 1920 to May 7, 1929, water was so furnished and paid for under the above-mentioned agreement without such formal written annual contracts as the parties executed in connection with the San Fernando Hospital. The first formal contract for the furnishing of water at the within-city rate was executed May 7, 1929, covering the period February 25 through the remainder of the fiscal year ending June 30, 1929. This contract gave defendant the right to renew it in accordance with all of its terms from year to year. It was so renewed for three succeeding years, the last renewal being until June 30, 1932.

What we have hereinbefore stated concerning the San Fernando Hospital with reference to the power and authority of plaintiffs under the City Charter and Ordinances to make and enter into such an arrangement and contract, as is here involved, applies to this item of the claim. In the circumstances disclosed by the record we think this hospital was properly and legally classified by plaintiffs as a within-city consumer. The pipe line from which the defendant obtained water was a within-city facility of plaintiffs through which they supplied water to residents within the City at the within-city ordinance rate. Plaintiffs received from defendant a valuable consideration in the form of the right-of-way which enabled plaintiffs to give water service to other within-city consumers at less cost to the city, which had the effect of removing in considerable measure, at least, the main reason for the higher ordinance water rate for water and service supplied to outside-city consumers. Tonawanda Board & Paper Co. v. City of Tonawanda, 198 App. Div. 760, 190 N.Y.S. 874; Pavilion Natural Gas Co. v. Hurst, 123 Misc. 477, 205 N.Y.S. 847; Village of Long Beach v. Long Beach Power Co., 104 Misc. 337, 171 N.Y.S. 824; Penn Iron Co., Ltd. v. City of Lancaster, 25 Pa.Super. 478.

Plaintiffs are not entitled to recover on this item of the claim.

We have decided plaintiffs' claim on the merits and therefore find it unnecessary to discuss the defense of estoppel.

 It should be pointed out, however, that, as contended by defendant and as has been uniformly held in cases brought in this court, if the contracts in question as to both hospitals were illegal, ultra vires, and, therefore, void, plaintiffs can only claim on the basis of a promise implied in law, rather than in fact, or on the basis of quantum meruit for the value of water and services furnished. A claim based on a promise implied in law cannot be enforced against the United States in this court. Ida F. Braun et al. v. The United States, 98 Ct.Cl. 176, 199, 200, 46 F.Supp. 993, and cases therein cited. There was no promise or agreement implied in fact that the outside-city ordinance rate would be paid by defendant. The record shows that plaintiffs carefully considered all phases of the agreements made, including the rate that was applicable in the circumstances. The rate to be charged and paid was, of course, the subject matter concerning which the negotiations and agreements were had and as to which the written contracts were made. When plaintiffs considered that approval of the City Counsel was necessary as to any phase of the subject matter under consideration, they obtained such approval. It is obvious that throughout the period subsequent to 1923 and at the times the contracts were made plaintiffs considered the matter whether the within-city or the outside-city ordinance water rate was applicable in the circumstances and whether the Board of Water and Power Commissioners had the power and authority under the Charter and the Ordinances to agree to the within-city rate. It is also obvious from the record that the Board came to the conclusion that it did have this authority. There is no substantial evidence that in the agreements arrived at with defendant and in the written contracts made pursuant to and in accordance therewith either party thought or considered that it was making a contract for payment by defendant of any rate other than the within-city rate. There is, therefore, no support for plaintiffs' contention that the parties intended only to contract for payment by defendant of the "applicable legal ordinance rate" and that this was the outside-city rate. The conclusion by plaintiffs, as shown by the facts and circumstances, and the provisions of the formal contracts, that the Board of Water and Power Commissioners was acting within the scope of its authority, is entitled to great weight. The Board and the defendant expressly agreed to the within-city rate, and no other promise or contract by defendant for another or higher rate can be implied. Hawkins v. United States, 96 U.S. 689, 697, 698, 24 L.Ed. 607; Smithmeyer v. United States, 147 U.S. 342, 359, 13 S.Ct. 321, 37 L.Ed. 196.

If it were held, contrary to what we think, that the contracts for the within-city rate were illegal and, therefore, unenforceable by either party, plaintiffs would only be entitled to recover on quantum meruit for the fair and reasonable value of the water and service furnished, and there is no proof in the record that this would be in excess of the within-city contract rate paid. See Douglas Aircraft Co., Inc. v. United States, 95 Ct.Cl. 140, 147. The rate fixed by the parties and paid by defendant would seem to be a fair and reasonable value since the proof shows that plaintiffs did not, at their expense, furnish defendant with any of the facilities and services customarily furnished by plaintiffs to outside-city consumers. It is doubtless for this reason that plaintiffs make no claim on quantum meruit.

The petition is dismissed. It is so ordered.

WHALEY, Chief Justice, concurs.

WHITAKER, Judge (concurring).

I am in doubt whether or not the Department of Water and Power of the City of Los Angeles had the authority to enter into the two contracts for the furnishing of water to the San Fernando and Sawtelle Hospitals at the within-city rate. On the one hand, if it did have such authority, then of course the plaintiffs are not entitled to recover because the contracts define the obligations of the parties, and the obligation cast upon the defendant has been fully performed. On the other hand, if it did not have the requisite authority, plaintiffs still are not entitled to recover because their suit would then be based on a contract implied, not in fact, but in law, and this court has no jurisdiction of such suits, as the majority opinion says.

Because I am in doubt about plaintiffs' authority to enter into the two contracts in question, I would prefer to place the

decision of the court on the ground that in either event plaintiffs are not entitled to recover.

MADDEN and JONES, Judges, took no part in the decision of this case.