**CLEMENS CONSTRUCTION COMPANY**
**v.**
**UNITED STATES.**
**No. 421–56.**

United States Court of Claims.
April 7, 1961.

8. See footnote 6.

9. Section 212(b) of the Economy Act, 54 Stat. 761.

Albert L. Reeves, Jr., Washington, D. C., Jesse E. Baskette, Eldon H. Crowell and Cummings, Sellers, Reeves & Conner, Washington, D. C., on the brief, for plaintiff.

Herman Wolkinson, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., San Francisco, Cal., Cyril Moscow, Washington, D. C., on the briefs, for defendant.

PER CURIAM.

This case was referred to Trial Commissioner Mastin G. White pursuant to Rule 45, 28 U.S.C.A., with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed January 6, 1960. Briefs were filed by both parties, exceptions to the commissioner's findings were taken by the defendant and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover and judgment will be entered to that effect with the amount of recovery to be determined in further proceedings pursuant to Rule 38(c).

It is so ordered.

### Opinion of the Commissioner

This case involves a controversy that arose out of a contract covering the construction of a levee in Florida by the plaintiff for the Corps of Engineers, Department of the Army.

In accordance with Rule 38(c), the trial was limited to the issues of law and fact relating to the right of the plaintiff to recover, and the determination of the amount of recovery and the amount of offsets, if any, was reserved for further proceedings.

### Embankment Placed

The principal legal question in the case relates to the interpretation that should be given to a contract provision stating that:

"Payment for construction of [the southern section of the] levee * * * will be made on the basis of quantities of embankment placed. Measurements of quantities to be paid for will be made by computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section. * * *"

The events leading up to the present litigation began on April 3, 1951, when the Corps of Engineers issued specifications, drawings, and invitations for bids relative to the prospective construction of Levee L–40 in Florida. The work was to consist of constructing 26.2 miles of continuous levee, running generally from north to south, with materials excavated from a continuous borrow pit along the west side of, and parallel to, the levee. The borrow pit was to be separated from the levee by a 40-foot strip of land. It was indicated that, before the actual excavation of material from the borrow pit and its placement as part of the levee began, both the surface of the borrow pit and the base of the levee were to be cleared and stripped of all vegetation, stumps, and roots.

The levee was to comprise two sections: a northern section slightly more than 2 miles in length, and a southern section slightly more than 24 miles in length. Only the southern section is involved in the present litigation.

The levee was to traverse a low, flat, wet area along the eastern edge of the Everglades. The ground in the particular area consisted, first, of a layer of peat, which is an organic, fibrous, compressible, and rather unstable soil. Prospective bidders were informed that

wherever in the southern section the thickness of the peat exceeded 4 feet, the peat should be removed from the borrow pit down to the point where the average thickness of the peat remaining in the borrow pit would be 3 feet. The excess peat so removed was to be wasted (i. e., it was to be deposited alongside and to the west of the borrow pit, and was not to be used as material for placement in the levee). Beneath the peat, there was a mixture of sand, shell, and conglomerate rock. The peat remaining in the borrow pit after the stripping operation and the removal and wasting of the excess peat (if required) was to be used along with the underlying material as part of the levee.

It was indicated that payment for the work performed in the northern section, and for the removal of the excess (or waste) peat from the borrow pit in the southern section, would be made on the basis of the quantity of material excavated from the borrow pit. In connection with this phase of the work, bidders were to quote as Item No. 1 a unit price of so much per cubic yard for "Excavation, unclassified."

On the other hand, prospective bidders were informed that the work of constructing the levee in the southern section would be paid for in accordance with the provision quoted at the beginning of this part of the opinion. Bidders were to quote as Item No. 2 a unit price per cubic yard for "Embankment" in connection with the construction work in the southern section.

The plaintiff submitted the lowest bid on the levee job mentioned above, and a contract was entered into between the plaintiff and the defendant (represented by a contracting officer of the Corps of Engineers) on May 7, 1951. The plaintiff's bid and the contract fixed $0.422 per cubic yard as the unit price for Item No. 1, "Excavation, unclassified," and the same amount per cubic yard as the unit price for Item No. 2, "Embankment."

The contract contained the provision previously quoted at the outset of this part of the opinion with respect to the basis of payment for the construction of the southern section of the levee.

In constructing the northern section of the levee, and in removing from the borrow pit and wasting excess peat in the southern section, the plaintiff excavated 1,039,599 cubic yards of material from the borrow pit. The Corps of Engineers paid the plaintiff for this work at the contract unit price of $0.422 per cubic yard for "Excavation, unclassified" (Item No. 1), or a total of $438,-710.78. There is no controversy between the parties respecting this phase of the work or the sufficiency of this payment.

In the southern section, after the levee base and the surface of the borrow pit had been stripped and the excess peat in the borrow pit had been removed and wasted, the plaintiff excavated from the borrow pit 4,798,058 cubic yards of material. A total of approximately 4,-618,058 cubic yards of this material was placed by the plaintiff upon the prescribed levee site; and the remainder of the material (or approximately 180,-000 cubic yards) was either spilled on the 40-foot strip of land separating the borrow pit from the levee site or was placed on the strip by the plaintiff to improve the working surface, and was not recovered by the plaintiff for placement as part of the levee.[1] With the placement of the 4,618,058 cubic yards (approximately) of material upon the prescribed levee site, the peat comprising the ground surface of the levee base, as it existed upon the completion of the stripping operation, subsided beneath the weight of the added material and became

---

[1]. The figures referred to in this sentence, and elsewhere in the report, as approximations represent estimates made on the basis of the evidence contained in the present record. If it should be held that the plaintiff is entitled to recover, the parties will have an opportunity in the subsequent proceedings before the commissioner under Rule 38(c) to develop and present data that are more precise concerning the amounts that are stated as approximations in this report.

inextricably mixed with it. The whole mass sank until it came to rest on the underlying sand, shell, and rock. This occurred during the construction of the levee, and before the embankment was measured for payment purposes.

Of the total of approximately 4,618,-058 cubic yards of material which the plaintiff placed upon the prescribed levee site in the southern section, approximately 1,288,617 cubic yards of the material either subsided (along with the ground surface of the levee base) below the line representing the elevation of the ground surface as it had existed after the stripping of the levee base and before the addition of the material from the borrow pit, or disappeared in the form of shrinkage as the wet material dried out after being incorporated in the levee embankment. As indicated above, this occurred during the process of construction, and before the embankment was measured for payment purposes. Neither the plaintiff nor the Corps of Engineers anticipated, at the time when the contract was made, that the subsidence and shrinkage would be of such magnitude and would occur so early in the life of the levee.

Measurement of the completed southern section of the levee revealed that the levee embankment, above the line representing the elevation of the ground surface as it had existed after the stripping of the levee base and before the addition of material from the borrow pit, comprised a total of 3,329,441 cubic yards. This total included 99,005 cubic yards of overbuilding beyond the tolerance provided for in the specifications. The Corps of Engineers deducted the 99,005 cubic yards of overbuilding from the 3,329,441 cubic yards previously mentioned, multiplied the remainder of 3,-230,436 cubic yards by the contract unit price of $0.422 per cubic yard for "Embankment" (Item No. 2), and thus computed that the plaintiff was entitled under the contract provision quoted at the beginning of this part of the opinion to a total of $1,363,243.99 for constructing the southern section of the levee.

Payment on this basis was made to the plaintiff under an arrangement whereby the plaintiff reserved the right to attempt to recover additional compensation.

In administrative proceedings which the plaintiff unsuccessfully prosecuted through various levels in the Department of the Army, up to and including the head of the Department, the plaintiff contended that it was entitled, in connection with the construction of the southern section of the levee, to additional compensation for 1,567,622 cubic yards of material at the contract unit price of $0.422 per cubic yard for "Embankment" (Item No. 2). It was the plaintiff's position in the administrative proceedings—and the plaintiff adheres to such position in the present litigation —that it excavated from the borrow pit and placed upon the prescribed levee site in the southern section 1,567,622 cubic yards of material over and above the 3,230,436 cubic yards of material used by the Corps of Engineers as the basis for computing the payment due the plaintiff in connection with the construction of the southern section.

The record before the court sustains the plaintiff's contention with respect to the excavation of the additional 1,567,622 cubic yards of material from the borrow pit in the southern section. However, the record establishes that 99,005 cubic yards of this material went into overbuilding beyond the tolerance provided for in the specification; and the plaintiff now concedes that it is not entitled to any additional compensation with respect to this yardage involved in the overbuilding. Moreover, it is also clear from the record that some of the 1,567,622 cubic yards of material (and the portion is estimated for present purposes at approximately 180,000 cubic yards) was spilled on the 40-foot strip of land separating the borrow pit from the levee, or was placed there by the plaintiff to improve the working surface, and never became part of the levee embankment.

On the other hand, the evidence definitely establishes that the major portion of the additional 1,567,622 cubic yards of material which the plaintiff excavated from the borrow pit in the southern section was placed upon the prescribed levee site and either subsided (along with the ground surface of the levee base) below the line representing the elevation of the ground surface as it had existed after the stripping of the levee base and before the addition of material from the borrow pit, or disappeared in the form of shrinkage as the wet material dried out after being incorporated in the levee embankment. The primary question in the case is whether the plaintiff is entitled to compensation for the placement of this material upon the prescribed levee site.

The contract provision with which we are concerned in this part of the opinion begins with a sentence which states in plain, unequivocal language that "Payment for construction of [the southern section of the] levee * * * will be made on the basis of quantities of embankment placed." It then proceeds to deal with the subject of how such quantities shall be ascertained for the purpose of calculating the payment due the plaintiff, and says in the second sentence that "Measurements of quantities to be paid for will be made by computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section." It is clear that, from the standpoint of syntax, the second sentence is subsidiary to the first sentence.

All the material which the plaintiff excavated from the borrow pit and placed upon the prescribed levee site in the southern section pursuant to the contract specifications was "embankment placed," as that term is ordinarily understood, and qualified for payment under the primary "Payment" sentence of the pertinent contract provision. However, the subsidiary "Measurements" sentence, as written, was impossible of application under the circumstances of this case, because when the time came to calculate the amount due the plaintiff for the construction of the southern section of the levee, the "ground surface existing after stripping of levee base" had subsided and disappeared, and was no longer in existence. The inability to apply the subsidiary "Measurements" sentence did not, of course, relieve the defendant of its basic obligation under the primary "Payment" sentence to pay for the construction of the southern section of the levee "on the basis of quantities of embankment placed." Williams et al. v. United States, 1955, 127 F.Supp. 617, 130 Ct.Cl. 435, 441. Such quantities were susceptible of being ascertained with reasonable accuracy by methods other than that mentioned in the subsidiary "Measurements" sentence.

The Corps of Engineers undertook to apply the "Measurements" sentence by interpreting it as though it stated that "Measurements of quantities to be paid for will be made by computing the volume between [the line representing the elevation of] the ground surface existing after stripping of levee base is completed, and the specified construction cross-section." However, the attempted revision and application of the subsidiary "Measurements" sentence in this fashion was inconsistent with the basic obligation of the defendant under the primary "Payment" sentence to pay for, and the basic right of the plaintiff to be compensated for, the "quantities of embankment placed," because large "quantities of embankment placed" were not paid for under the revised "Measurements" sentence.

We are dealing here with a contract provision that was drafted by Government personnel. In view of this factor, it would be inappropriate for the court to follow the example of the Corps of Engineers by adopting an interpretation of the provision which would, in effect, ignore the primary "Payment" sentence and expand the language of the subsidiary "Measurements" sentence in order to make the subsidiary sentence

meaningful and controlling under the circumstances of the present case, since such an interpretation would favor the defendant and be disadvantageous to the plaintiff. Peter Kiewit Sons' Co. v. United States, 1947, 109 Ct.Cl. 390, 418; Orino, Executrix v. United States, 1948, 77 F.Supp. 938, 111 Ct.Cl. 491, 518–519.

For the reasons stated above, it is my opinion that the "Payment" sentence should be given effect, and, accordingly, that the plaintiff is entitled to recover additional compensation for those "quantities of embankment placed" in the southern section of the levee that have not been paid for by the defendant heretofore.

### Liquidated Damages

The contract contained a paragraph stating in part as follows:

"The Contractor will be required to commence work under the contract within 30 calendar days after the date of receipt by him of notice to proceed and prosecute the said work at an average rate per month of not less than 375,000 cubic yards * * *, and to complete the work within the number of days after the limiting date set for commencement as determined by applying the average monthly rate above stipulated to the aggregate of total quantities of material actually excavated (under Item 1) and actually placed in the embankment (under Item 2) and to be paid for under the contract * * *."

The contract then provided that:

"In case of failure on the part of the Contractor to complete the work within the time fixed in the contract or any extensions thereof, the Contractor shall pay the Government, as liquidated damages, the sum of $200.00 for each calendar day of delay until the work is completed or accepted."

The plaintiff received a notice to proceed on June 22, 1951. This fixed July 22, 1951, as the date on which the plaintiff was required to commence work under the contract. The work was completed by the plaintiff and accepted by the Corps of Engineers on December 29, 1952.

As indicated in the first part of this opinion, the Corps of Engineers calculated that the plaintiff was entitled to payment for 1,039,599 cubic yards of "Excavation, unclassified" (Item No. 1) and 3,230,436 cubic yards of "Embankment" (Item No. 2), or a grand total of 4,270,035 cubic yards. On this basis, the Corps of Engineers regarded July 4, 1952, as the date on which the plaintiff was required to complete all the work under the contract. Accordingly, the Corps of Engineers assessed against the plaintiff liquidated damages at the contract rate of $200 per day for 178 days of delay from July 5, 1952, to December 29, 1952, or a total of $35,600. This amount was withheld by the Corps of Engineers in paying to the plaintiff the amount of compensation believed by the Corps of Engineers to be due the plaintiff for the work under the contract. Such action, although protested by the plaintiff, was sustained in the administrative proceedings mentioned in the first part of the opinion.

I believe, for the reasons given earlier in this opinion, that the plaintiff is entitled to compensation for additional "quantities of embankment placed," over and above the 3,230,436 cubic yards used by the Corps of Engineers in calculating the amount of compensation due the plaintiff for the construction of the southern section of the levee and the length of time that was available to the plaintiff for the completion of the work. If my view on that point is correct, the final date for the completion of the work was not July 4, 1952, as determined by the Corps of Engineers, but some subsequent date based upon a calculation that would take into account the additional "quantities of embankment placed."

It necessarily follows that, in my opinion, the plaintiff is entitled to recover at least some of the liquidated damages assessed and withheld by the Corps of Engineers.