Madden, Judge,
delivered the opinion of the.court:
Plaintiff contracted with the defendant to build some thirteen officers’ quarters at Bolling Field in the District of Columbia for $142,046.00. Plaintiff was to furnish all labor and materials to complete the job, except common bricks, which were to he furnished by the defendant. According to the specifications, the basement walls were to be constructed of common bricks, and the walls above the basement were to have a facing of facing bricks backed with common bricks. Before plaintiff submitted its bid, its representatives visited the site and asked to see the common bricks which the defendant intended to furnish for the job. The defendant’s Constructing Quartermaster, who was to be the defendant’s representative in dealing with the contractor, *526 showed plaintiff’s representatives a stock pile of more than a million salvaged common red shale bricks of good quality. Plaintiff took samples of these bricks and in computing the amount of its bid estimated the amount of labor and mortar to be used in laying the bricks under the contract on the assumption that common bricks such as were in the stock pile would be furnished.
Plaintiff subcontracted the labor of laying the bricks for $11,400. The bricklaying began September 12, 1932, and bricks from the stock pile were used for about a month. Then the defendant’s agents directed plaintiff to use no more bricks from the stock pile, but to use bricks salvaged from a dismantled steel plant near the site and cleaned. Plaintiff asked for and obtained the contract to clean these bricks. The steel plant bricks were irregular in size and shape, many of them being fire bricks, which are considerably larger than common bricks, and are pemus and absorb the water from the mortar and thus create difficulties in laying them. The larger size of the steel plant bricks made the walls thicker and thus required the use of more mortar.
Plaintiff’s subcontractor protested to plaintiff at the change in the kinds of bricks, and plaintiff agreed to pay him extra compensation for his extra labor: Plaintiff protested orally to the defendant’s representative, the Constructing Quartermaster, who entered into an oral agreement with plaintiff that plaintiff would continue to use the steel plant bricks and would later present its extra costs to the Constructing Quartermaster for audit.
September 25, 1933, after the completion of the contract, plaintiff submitted a claim to the then Constructing Quartermaster for its additional costs, but nothing has been paid plaintiff in that regard. Plaintiff’s increased cost of mortar was $1,649.26, and plaintiff paid its bricklaying subcontractor $4,000.00 to settle a law suit brought against plaintiff by the subcontractor for the increased cost of laying the irregular bricks.
Plaintiff, no doubt for the purpose of by-passing obstacles in the shape of non-compliance with formal requirements of the contract, plants its case upon the theory that the defendant breached the contract as written, when it ordered the *527 use of the steel plant bricks, and thereby excused plaintiff from strict performance of the contract and laid itself liable to compensate plaintiff for the losses caused by its breach.
We think that plaintiff’s theory is not supportable. We think that the Contracting Quartermaster’s direction to plaintiff was, except for the form in which it was given, a modification which the defendant had the power'to make, under the terms of the contract. It was either an order for extra work or material within the provisions of Article 5 of the contract and Section 27 of the specifications, or a change order under Article 3 of the contract, which provisions are quoted in finding 15. We are therefore obliged to determine whether the obstacles to recovery which plaintiff by its theory sought to avoid are insuperable, as the defendant urges.
We think that Article 5 of the contract is the applicable article. The Constructing Quartermaster’s direction to use the steel plant bricks was, in effect, an order to use whatever extra labor and extra mortar it 'would take to make walls out of such bricks. So Article 5 fits the situation quite precisely. If neither Article 5 of the contract nor Section 27 of the specifications were present, Article 3 might be made to apply, but that is not necessary with these other provisions present.
When one party writes a contract in its own language, as the Government did here, and inserts in it two separate provisions, either of which might apply to a given state of facts, but different legal consequences would result if one, rather than the other, of the two provisions was applied, the other party to the contract is, in the absence of evidence of a contrary intent, entitled to have applied the provision which would be least burdensome to him.
The defendant urges that, even though Article 5 is the applicable article, and it contains no requirement of approval by the head of the department of an order for extra work or material, yet such a requirement should be read into Article 5 by implication. The defendant argues that the contract is not very rational unless these two articles are read as being consistent with each other. We are inclined to agree. But it was the defendant’s writing, its standard *528 form of contract prepared with great care, used by it thousands of times, and we are not willing to read into it important provisions which are not there, in order to enable the defendant to escape from pajdng'for what its officer ordered, and the defendant has received and is, presumably, .now enjoying.' We conclude therefore that under a proper interpretation of the contract, the order of the Constructing Quartermaster- was given under Article 5 of the contract, and the approval of the head of. the department, written or otherwise, was not necessary to the validity of the order.
•We coiné now to the question whether the• Constructing Quartermaster's failure to write his order for the extra work and materials prevents plaintiff from recovering for them.
It would have been impracticable for either plaintiff or the Government to have followed strictly the injunction of Article 5 in this case. The right price for the extra work and mortar could only have been guessed at when the order was first given. Ordinary prudence on the part of each •would have required what was done here, viz, the deferment of consideration of the cost to a later time. Our observation of cases litigated here tells us that this kind of prudence is frequently practiced in such situations. If the Constructing Quartermaster had done here what was agreed to be done, and had given plaintiff a written order after the extra cost had been determined, the bill would quite certainly have been paid, though Article 5 would not have been strictly complied with. If the Constructing Quartermaster had, at the time he gave his order, said in writing what he said orally, that would not have been a compliance with Article 5, which requires that the “price (be) stated in such order.” Strictly, plaintiff could not have protected itself against what has here happened to it except by refusing to obey the order and demanding that the Constructing Quartermaster do, in writing, what was impossible to do at all, viz, fix a price which could not prudently be fixed at that time. Perhaps that would have been correct practice.
Our question is, however, not what would have been correct practice when the extras were ordered, but what to do with a case in which the responsible representative of the *529 Government has not done nor has the contractor insisted upon his doing what the contract enjoined him to do at that time; a case in which, moreover, the contractor has, pursuant to an oral rather than a written order, performed just what the Government wanted to be done, and the Government has taken the product of that performance but refuses to pay for it. If we say that the position of the Government is legally correct, we thereby refuse to remedy a grave injustice because of the omission of a formality, because the words of the contracting officer were spoken and not written and did not say what was then impossible to say.
The law as it relates to persons other than governments has frequently encountered the same problem, and has usually succeeded in vindicating the purpose of the formal requirement, without at the same time leaving one man’s money in another man’s pocket. For example, the Statute of Frauds, setting up a formal requirement by statute, and not by mere contract, and threatening the unwritten transaction with such ominous consequences as that it should be “void,” has not, in effect, been permitted to do more than to nullify unperformed agreements, leaving the parties, in general, where they would have been if the informal transaction had not occurred. Likewise the omission of a seal, if in fact there is a consideration paid, only demotes the deed to the position of a contract, fully enforceable in equity.
Even in the sphere of government dealings, the neglect to advertise for bids, though such advertisement was required by statute, has not been permitted to justify the Government in receiving property manufactured for it and using it without paying what it was reasonably worth.[1] Nor has the fact that a contract was not “reduced to writing and signed by the parties with their names at the end thereof” as required by Revised Statutes, Sec. 3744, been held to justify the Government in receiving the benefits of a contract informally made and refusing to pay for them. United States v. Andrews, 207 U. S. 229, 243; see St. Louis Hay and Grain Co. v. U. S., 191 U. S. 159, 163.
If the law has been able to accomplish so much justice, in the face of apparently forbidding statutes, without impair *530 ing the purpose and policy of the statutes, we think as much should and can be done with words in a Government contract, such as the words in Article 5 of the contract here in question. If the transaction had remained unperformed, -it would probably have been, because it was oral, unenforceable. But in the instant case the building was built of the materials and with the labor orally ordered. There was not only part performance, but full performance, constituting concrete evidence of what the order was, which was, in addition, undenied by the Government. By any of the tests applied in the analogous situations with which the law has dealt, plaintiff is entitled to be paid.
There is not a word in the record to show that thé order of the Constructing Quartermaster, by which he saved some hundreds of thousands of bricks of good quality and diverted them to a more economical use for the Government, was in fact given without consultation with and sanction of his superior officers in the department. There is no evidence that the department was not pleased at and benefited by the result accomplished by the order. There is no evidence that the Constructing Quartermaster was disciplined or even reprimanded for having, in violation of the mandate of the defendant’s standard contract, ordered this extra work, the consequence of which was, unless we give relief, to cheat this plaintiff out of a large amount of money, and involve the department in an act of repudiation which, if done by anyone other than a government, would be. regarded as dishonorable, even if legally permissible. ■
What we have said leads us to this conclusion: when the contracting officer orally directed plaintiff to use the steel plant bricks, and promised it that an adjustment would be made when the work was completed and the fair amount determined, and when that direction was performed by plaintiff by doing the work and using the required material, a contract to pay plaintiff the reasonable cost of the work resulted.
We recognize that the-decision of the Supreme Court of the United States in Plumley v. United States, 226 U. S. 545, is contrary to what we have said. We see no distinction, *531 in principle, between that case and the cases of United States v. Andrews and St. Louis Hay and Grain Co. v. United States, discussed above. All the authorities in comparable legal situations are in accord with the latter cases, and we think it is our duty, to follow this general trend of authority, which leads to what we regard as a just decision, rather than the Plwmley case, which seems to stand alone. This court decided the case of Griffiths v. United States, 77 C. Cls. 542, as we decide this case, though it did not discuss the Plwmley case.
Plaintiff is entitled to recover $6,835.61.
It is so ordered.
Littleton, Judge, concurs.

 See Douglas Aircraft Company, Inc., v. United States, 95 C. Cls. 140.