Russell H. WILLIAMS, d/b/a Williams Equipment Co., and Reed & Martin, Inc., A Corporation

v.

The UNITED STATES.

No. 50403.

United States Court of Claims.

Jan. 11, 1955.

William H. Ferguson, Seattle, Wash., Donald McL. Davidson, Washington, D. C., on the briefs, for plaintiffs.

Kendall M. Barnes, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

. Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This case involves a contract between the plaintiffs and the defendant for the construction of a paved road at Fairbanks, Alaska. The facts have been set out in detail in our findings and will be referred to only to the extent necessary for an understanding of the issues which gave rise to the suit.

The principal issue has to do with the amount of borrow material which was excavated by the plaintiffs and put in place on the road. The contract provided for payment for the borrow material at $1.29 per cubic yard and the payment for hauling the material beyond a certain distance at a unit price of 32 cents per cubic-yard mile. The borrow material yardage to be paid for was to be measured in its original position in the borrow pit, which yardage was to be

computed by the average end area method, and the overhaul item was to be paid upon the measurement of material in its original position times the overhaul distance in miles and fractions thereof. In other words, an important consideration in determining the amount due the plaintiffs was a determination of the amount of borrow material in its original position.

The face of the quarry rose from a flat surface at a steep, though not vertical, angle. The average end area method contemplated that surveys be made of the vertical profile of the quarry at frequent intervals along its face, both at the beginning and at the end of the quarrying operations. The extent to which the profile upon final survey had receded from its original position would then be the basis for measuring the amount of material that had been removed from the quarry. At or about the time the plaintiffs began work a survey was made of the quarry. After some 30 or 40 percent of the excavation work had been completed, a slide occurred at the quarry in which a large amount of material moved downward and outward toward the base line where the plaintiffs were operating. The amount of material moved was estimated by a witness for the defendant as from 30,000 to 50,000 cubic yards, and by witnesses for the plaintiffs as from 200,000 to 400,000 cubic yards. A fair statement from the evidence would be that defendant's witness was too conservative and the estimates of plaintiffs' witnesses excessive. Whatever may be the correct amount, when we consider that the total amount of material moved, as computed by plaintiffs, was 99,592 cubic yards and that 34,596 had been removed at the time of the slide, the possible effect of such a slide on the computation of material in place by the average end area method can be seen.[1] Not only did material come into the area from outside for which no cross section had been prepared, but also certain points on the original survey were wiped out.

After the contract was completed the contracting officer caused a final survey to be made and on a comparison of that survey with the original survey computed the borrow material excavated as 69,349.7 cubic yards. During the course of the contract plaintiffs had been paid for this item on a truck-measurement basis, on which basis the borrow material removed had been computed at 99,592 cubic yards, that is, some 30,000 more than the contracting officer computed on the average end area method. The plaintiffs took an appeal from that decision of the contracting officer to the Commissioner of Roads for Alaska, the desig-

---

[1]. The slide created several difficulties in applying this method of measurement. A considerable part of the material which had broken loose as a result of the slide was still on the face of the quarry at the time of the final survey. In fact, in certain parts of the quarry the final survey profiles indicated that the face of the cliff had expanded over the original profile lines. The slide material, as a result of having been dislodged from its original position, had expanded considerably beyond the volume it occupied in the original position. This expansion tended to make the profile lines of the final survey appear to have receded less than they would otherwise have done. To the extent, therefore, that such slide material was still on the face of the quarry the end area method tended to understate the net volume of material in place actually removed from the face of the quarry by the plaintiffs. The slide also created fissures, some of which had the effect of moving the face of the quarry forward beyond the point where it would otherwise have been. This again tended to understate the amount of material removed by plaintiffs when using the end area method. The defendant made no corrections for these factors in its computations.

Furthermore, the slide carried substantial amounts of material from parts of the quarry that had not originally been surveyed into parts when the plaintiffs' quarrying operations were going forward. It became necessary, therefore, to find out the original profile of the unsurveyed parts of the quarry. This could be done only by use of interpolations from those parts of the quarry which had been surveyed at the beginning, a process which tended to create some inaccuracies.

nated representative of the head of the department, who affirmed the decision of the contracting officer. This suit followed.

When this case was tried and when a report thereon was filed by the commissioner, the last word on the question of the finality of the decision of the head of the department had been stated by the Supreme Court in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, in which the Court said that a decision made by the head of the department under the "Disputes" clause of a government contract was final and conclusive unless fraud on his part was alleged and proved. The commissioner found that fraud, as measured by the formula set out by the Supreme Court in that decision, had not been established by the plaintiffs. However, after the report had been filed, the Congress passed and the President signed Public Law 356, 83d Congress, 2d Session, 41 U.S.C.A. §§ 321, 322, which provided that the decision of the head of any department or agency in any contractual dispute shall not be final and conclusive where "the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."

We are satisfied from the evidence and have found as a fact that the decision of the head of the department was not supported by substantial evidence. In reaching this conclusion we have considered the evidence on both sides in order to determine whether it appears that the evidence in support of the administrative decision can fairly be said to be substantial in the face of opposing evidence. See Willapoint Oysters v. Ewing, 9 Cir., 174 F.2d 676, certiorari denied 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527. In a recent decision by the Supreme Court, Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456, the Court made the following statement with respect to the rule relating to substantiality of evidence to support an administrative decision:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation [Administrative Procedures Act, 5 U.S.C.A. § 1001 et seq., and Taft-Hartley Act, 29 U.S.C.A. § 141 et seq.] definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record."

The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.

As we view the evidence, it is difficult to see how it could be said that there was substantial evidence to support the decision made by the contracting officer and the head of the department in the face of the opposing evidence. What these administrative officials tried to do was to compute the amount of borrow material removed by the use of a method which had been made impossible of accurate application because of the slide which had occurred. It is true that the contract provided for the use of this method but only as a means of determining the amount of material removed for which the plaintiffs were to be paid. The real question was how much material had been removed. Not only were some of the original survey elevations wiped out but also substantial amounts of material came from outside into the area where the plaintiffs were working and from which material had been removed. These factors contributed to errors in comparing the original survey with the final

survey for the purpose of a comparison of the material removed. Defendant recognized some of these difficulties and undertook through interpolations or estimates to supply the original survey elevations which were wiped out, and otherwise compensate for the changed conditions. That it did not do so in a satisfactory manner is plainly evident from the opposing evidence which was before the administrative officials when the final decision was made and which they contend confirmed the original decision.

In the first place, when the plaintiffs complained of the decision of the contracting officer, the possibility of error was recognized and an effort made to check that computation. The first method used was to have a mass diagram prepared of material in place on the road.[2] Then a computation was prepared which would show the amount of borrow material in place in its original position in the quarry which would be required to produce the material in place on the road as shown by the mass diagram. This computation resulted in a determination of 66,566.5 cubic yards of borrow material as compared with 64,735.9 cubic yards used in the contracting

officer's determination for roadway embankment (69,349.7 less 4,613.8, which represented material rejected in spoils pile at the quarry and overburden). While the amount so computed was not substantially greater than the amount computed by the contracting officer, it failed to take into account as shown by finding 25, substantial amounts of material which were used and for which the plaintiffs were entitled to be paid. With these omitted amounts added to the 66,566.5 cubic yards which were computed, the amount becomes substantially greater than that allowed in the final determination.

A second check on the accuracy of the average end area method was made while the appeal was pending through what is known as a specific gravity test. By such a test it was expected that a determination could be made of a change in volume from a solid rock condition of the material in the quarry to a disturbed condition of the same material in a truck, that is, a determination of the percentage of swells or voids in the material loaded in a truck as compared with the material in a solid condition in the quarry.[3] In spite of the fact that in making the test a 3-ton truck was used

2. This diagram was evidently made by comparing the plans of the vertical cross sections before and after the road was built. The road as finished deviated in certain respects from the plans with the result that additional borrow was required over that contemplated on the plans. Furthermore, the new road was built on top of an old road which sank in some places during the construction and thus required additional fill. Neither of these factors was accounted for in the mass diagram.

3. The specific gravity method used by the defendant consisted of two parts. The first part determined that a 3-ton truck loaded level to the bed of the truck contained 33 percent voids and 67 percent solid rock by volume. The 33 percent figure was arrived at by taking the specific gravity of representative samples of rock and applying this specific gravity to the weight and volume of the load of a 3-ton truck loaded level to the top of its bed. It does not appear, however, that this 33 percent figure was intended to represent the exact increase in the volume

of material from its virgin state to its volume loaded on the truck since no account was taken of voids that might occur in the material in the virgin state. Furthermore, the amount of voids in a small 3-ton truck might well be considerably less than the voids in 6-, 7-, or 8-ton trucks which were the types of sizes actually used. The following computation, though not made by defendant's engineers, is significant. Assuming that the total cubic yards of plaintiffs' truck-count figures took into account a uniform swell factor of 25 percent, then the uncorrected volume of material removed amounts to 132,789 cubic yards; if the plaintiffs' truck-count figure used a swell factor of 20 percent, then the uncorrected volume amounts to 124,490 cubic yards. Applying the 33 percent swell factor of the specific gravity test to those figures yields 88,946 and 83,408 cubic yards, respectively.

The other part of the specific gravity method determined the percentage of voids in the heaped load on a truck having

instead of a 6-ton or larger truck of the type in use by the plaintiffs during their operations, and that the allowance for the swell factor was unfavorable to the plaintiffs, a yardage was computed of 76,000 cubic yards instead of 69,349.7 determined by the contracting officer. We are convinced that with the use of a truck of the proper size and with the swell factor appropriately resolved an even greater disparity would have been shown.

The third type of evidence before the head of the department when the final decision was made was the truck-measurement basis contended for by the plaintiffs. Prior to the commencement of the hauling operation, defendant's resident engineer and a representative of the plaintiffs measured each of the trucks on the job and calculated the dimensions of their gross load when heaped full. The volume of each truck as measured was reduced by a swell factor to allow for voids in the material in the trucks as compared with the material in its undisturbed state in the quarry. Each load was checked by inspectors of the defendant both upon departure from the borrow pit and on delivery at the road. Monthly progress payments were made to the plaintiffs by the defendant on the basis of these tabulations. The total yardage computed by this method was 99,592 cubic yards. The major objection raised by the defendant to the accuracy of such computation was that sufficient allowance was not made for swells or voids in the material. In our findings we have

agreed that some more allowance should be made for voids than was made in that computation but we are satisfied from the evidence that such allowance should be less than that contended for by the defendant and therefore the amount computed on this basis would likewise be substantially more than that allowed by the head of the department.

What we have, therefore, is a situation wherein the head of the department made a determination of an amount of material removed which was substantially less than the amount computed by any one of three other methods. When we consider the inaccuracies which would certainly result from an attempted use of the average end area method under the changed conditions resulting from the slide, it is difficult to see how three other computations, all of which resulted in substantially greater amounts, could be said to give anything approaching a confirmation of the amount determined by the head of the department. The contradictory and conflicting evidence so detracts from the weight of the evidence in support of the decision as to leave it without substantial support. On the contrary we are convinced that the substantial weight of the evidence supports an amount in excess of that allowed by the head of the department. In our findings we have found that 84,471 cubic yards of borrow material were excavated which is 15,-121.3 cubic yards more than that allowed by the defendant. Since the contract price was $1.29 per cubic yard for the excavation of this borrow material, the

a sideboard level capacity of 6.35 cubic yards. The bed of this truck had inside dimensions of 6.6' x 10.0' x 2.6' as compared to 6.5' x 7.96' x 1.56' of the truck that was used in the previous test. The volume of the heap on such a truck was estimated to be ten-eighths of the volume of the heap on a test truck, or ten-eighths of 1.28 cubic yards which equals 1.60 cubic yards. The total load yardage for such a truck in heaped condition was, therefore, 6.35 cubic yards plus 1.60 cubic yards, which equals 7.95 cubic yards. Applying the 33 percent figure computed above, the engineers arrived at an actual volume of rock of 5.33 cubic yards. The

defendant's engineers further assumed that such heaped 6.35 cubic yard trucks were credited with actually having hauled seven cubic yards of material in the plaintiffs' truck-count computation. The basis for this assumption is not clear. Dividing 5.33 into 7, the defendant determined that plaintiffs had only excavated 76 percent of the amount with which they were credited under the truck-count method. This percentage was then applied generally to the total cubic yardage which the truck-count method had credited to the plaintiffs, that is, 76 percent of 99,592 cubic yards, which is approximately 76,000 cubic yards.

plaintiffs are entitled to recover $19,506.-48 on this item.

Since the amount allowable for the overhaul item varies in direct proportion to the volume of borrow material removed, the cubic-yard miles allowable on this item is 267,727.8 instead of 217,-032.4, that is, 50,695.4 cubic-yard miles more than allowed by the defendant. At the contract price of 32 cents per cubic-yard mile, this amounts to $16,222.53, which the plaintiffs are entitled to recover on this item.

The other issue in the case involves questions of law and arises out of an entirely different set of facts from those just discussed. One of the items involved in the contract was the paving of the road with asphalt. In order to do this work, the plaintiffs had considered renting or buying an asphalt plant in the State of Washington. The rental cost of such a plant would have been approximately $10,700. After the job got under way, the plaintiffs learned that there was a plant located at Ladd Air Force Base which was under the jurisdiction of one Major Russell who was responsible for the maintenance of the roads at the Air Force Base. One of the plaintiffs made inquiry of Major Russell as to whether arrangements could be made for the plaintiffs to use the plant. Major Russell suggested that certain roads on the Base needed seal coating and if plaintiffs would do this work they could use the plant on the road job. After certain negotiations during which Major Russell represented that he had been given authority to enter into the agreement, the plaintiffs submitted a written proposal which was accepted by Major Russell as Air Installation Officer, whereby the plaintiffs agreed to seal coat the main paved roads on the base in return for the use of the asphalt plant to produce asphalt for the road job.

Upon the approval of that agreement by Major Russell, the plaintiffs proceeded to carry out their part of the agreement which they did by seal coating some nine or ten miles of roads in a manner satisfactory to the Air Force Base authorities. The value of such work was in excess of $10,000.

In the meantime, Major Russell had forwarded to his superior officer copies of the agreement which he had approved for seal coating of the roads in return for the use of the asphalt plant by the plaintiffs. Shortly after the seal-coating job had been completed but prior to the time when the asphalt plant had been delivered to the plaintiffs, Major Russell's superior officer advised him that there was no authority for such an agreement and that work thereunder should be stopped immediately. Major Russell replied that the work had already been completed and urged that since the plaintiffs had carried out their part of the agreement and since the agreement was in the best interests of the Government, the plaintiffs should be permitted to use the asphalt plant. However, Major Russell's superior officer refused to change his position. Major Russell advised the plaintiffs of his inability to carry out the agreement but suggested that arrangements be made to have the plant borrowed by the Alaska Road Commission and then rented by the Commission to the plaintiffs. Major Russell stated that if this could be arranged he would arrange for payment for the work which had already been done by the plaintiffs at Ladd Field. As a result the asphalt plant was turned over by Major Russell to the Alaska Road Commission which, in turn, made it available to the plaintiffs at a rental figure of $1.30 per ton. In agreeing orally to that rental figure, the plaintiffs relied upon the assurance previously given by Major Russell that they would be paid for the work which they had already performed at Ladd Field.

The plaintiffs used the asphalt plant in paving the roads under their contract. At or about the time the paving was completed, Major Russell advised the plaintiffs that payment could not be made by the defendant for the seal-coating work which had been performed by them at Ladd Field. Thereupon the plaintiffs

refused to sign a change order prepared by the Alaska Road Commission reducing the unit price of asphalt by $1.30 per ton. However, the contracting officer, in the final settlement under the plaintiffs' contract, directed that the change order be considered a written order changing the specifications and that the rental stipulated therein be deemed to be an equitable adjustment of the contract price. Upon completion of the contract, it was determined that 7,820.3 tons of asphalt had been actually used and accordingly $10,166.39 was deducted from payments to the plaintiffs. On appeal to the head of the department, the decision of the contracting officer was affirmed. No amount has been paid to the plaintiffs on account of the work which they did at Ladd field.

What the plaintiffs are suing for is the amount just referred to which was deducted from amounts otherwise due them under the contract involved in this proceeding. No question is raised by the defendant as to the fact that the plaintiffs performed the services or that the services were worth at least the amount now sued for. The sole defense of the defendant is that since Major Russell was not a contracting officer with full authority to bind the Government in the fullest contractual sense, the plaintiffs cannot recover on this item. Surely, compelling reasons would be required to have any court sanction any such inequitable result and we do not think such reasons exist. Whatever might be said with respect to the lack of authority on the part of Major Russell to enter into a binding contract, it is certainly true that the plaintiffs proceeded in an entirely appropriate and proper manner in entering into the agreement and did so only after they were assured by Major Russell that he had authority to do so. Likewise, Major Russell had also proceeded in good faith in the entire matter and had been assured by Washington that such an arrangement would be satisfactory. The roads that were seal coated were wholly within the base where the contracting officer was located. It seems incredible that he did not know all about the agreement and by his inaction ratify it. Certainly he did not repudiate the agreement, and he did not appear as a witness. The plaintiffs carried out their part of the agreement for which the Government received the benefit. We feel that there then arose an implied contract under which the defendant was obligated to pay the value of the services rendered by the plaintiffs. Recovery is accordingly allowable for this item in the amount deducted under the contract, $10,166.39. Cf. W. H. Armstrong and Company v. United States, 98 Ct.Cl. 519, 529; Stiers v. United States, 121 Ct.Cl. 157, 172; and Pacific Maritime Association v. United States, 123 Ct.Cl. 667, 676.

Judgment will accordingly be entered for $19,506.48 for the material item, $16,222.53 for the overhaul item, and $10,166.39 for the asphalt plant item, making a total of $45,895.40.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.