**CENTRE MANUFACTURING COM-
PANY, Inc.**

v.

**The UNITED STATES.**

No. 345–66.

United States Court of Claims.

March 15, 1968.

Samuel F. Schwag, Philadelphia, Pa., attorney of record, for plaintiff.

Stephen M. Joynt, Bladensburg, Md., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant. Lewis H. La Rue, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

## OPINION

DURFEE, Judge, delivered the following opinion, in which the CHIEF JUDGE and Judge LARAMORE join, and announced the judgment of the court: *

Plaintiff, a clothing manufacturer, was awarded two contracts to make 156,-000 raincoats for Air Force use. The first contract (hereafter referred to as No. 2787) was awarded on July 1, 1963, and the second (hereafter referred to as No. 3384) on October 1, 1963.

The raincoats were to be manufactured according to patterns and specifications furnished by the Government. Although similar raincoats had been made by other contractors for the Marine Corps, the patterns and specifications for the instant contract were new as to the sleeve-setting and seaming operations, and it is the new specifications that are involved in the present suit.

Plaintiff reached the sleeve-setting operations and the sealing of the armholes under Contract No. 2787 approximately on September 1, 1963, having cut material for about 3,300 raincoats exactly in accordance with the Government-furnished pattern. As sleeves were set and the seams sealed on this first group of coats, plaintiff performed hydrostatic tests in its own laboratory on the semi-finished coats in the same manner and with the same equipment used by the Government. The contract provisions relevant to the sleeve-setting and sealing operations are set out below.[1]

---

* Facts necessary to support the court's judgment in this case are set forth in the decision. The court acknowledges the helpfulness of the opinion of Trial Commissioner James F. Davis, but treats the issues somewhat differently.

1. 24. SET SLEEVES—The sleeves shall be set with fulness properly distributed with armhole and sleeve steps matching.

 a. Seam sleeves to armhole of coat with a single row of stitching. The width of the seam shall be ⅜ inch at top of armhole, step to step, and ³⁄₁₆ inch at bottom of armhole, step to step. * * *

 b. Turn sleeve and raise stitch armhole with a single row of stitching ⅛ inch from edge a distance of 5½ inches on each of shoulder seams. Cross over and continue the raise stitching around the armhole ¹⁄₁₆ inch from edge.

 3.3.4 SEALING OF SEAMS AND STITCHING—All side seams, sleeve-armhole joining seams, sleeve-joining seams * * * shall be sealed on the inside with brush coats of seam sealant specified in 3.1.6 * * *. The sealant shall be brushed on and worked in such a manner as to completely wet and cover the stitching and needle holes and worked under any turned edges of the seams.

 3.3.4.1 * * * The seams shall be sealed with a sufficient number of coats of seam sealant and dusted in such a manner that the finished raincoat meets the hydrostatic and blocking requirements * * * when tested as specified.

Mr. Dotson, plaintiff's general manager, testified that from the very beginning plaintiff encountered difficulty with the water resistance of the sleeve-armhole seam. He testified further that when the sleeve-armhole seams were sealed with the four coats of sealant, which was the usual number of coats of sealant used in the art,[2] plaintiff encountered 50 percent hydrostatic test failures, i. e., the sleeve-armhole seams were not sufficiently waterproof.

In searching for the cause of the sealing difficulties, plaintiff first double-checked all its own operations and materials. It made a few minor adjustments, but the difficulties continued unabated. The contractor finally concluded, after consultation with the Government technical adviser specifically assigned to this contract (Mr. Rossi), that the fault was in the Government-supplied patterns and specifications, viz., the seam width at the top of the armhole, required by the pattern to be $3/8$ inch, had $1/4$ inch surplus material after the seam was raised-stitched or "corded." By way of contrast, the specifications required a $3/16$ inch seam at the bottom half of the armhole, which left only $1/8$ inch surplus material after cording. It was discovered that the top half of the armhole seam ($1/4$ inch surplus) caused sealing difficulties whereas the bottom half with its smaller seam allowance ($1/8$ inch surplus), did not.[3] Both Dotson and Rossi concluded that the seam was too wide around the top half and this was the cause of the sealing difficulties. In addition, the sleeve was designed (by the Government) to have a certain fullness, which, in the process of sleevesetting, created ripples, pleats and tubes in which water collected during the hydrostatic tests. This accumulation of water increased the sealing problems caused by the surplus material or "step."

As a temporary solution, plaintiff applied additional coats of sealant on the defective seam construction. Many raincoats required four additional coats of sealant and some as many as eight additional coats of sealant. One lot of 1,280 completed coats (hereinafter referred to as Lot 1) was submitted to the Government on September 13, 1963. This lot passed the Government's hydrostatic tests and was accepted, although it must be remembered that many of these raincoats had eight and twelve coats of sealant on the sleeve-armhole seam. A second lot of 2,000 completed raincoats (hereafter referred to as Lot 2), with the usual number of coats of sealant on the troublesome seam, was then submitted to the Government, but this lot was rejected for failure of the hydrostatic tests again at the sleeve-armhole seam. Plaintiff then subjected this second lot of raincoats to an additional four or eight coats of sealant at the sleeve-armhole seam and re-submitted the coats. This time the lot was accepted.

During the course of these difficulties with the sleeve-armhole seam, the contractor was in telephonic communication with the contracting officer, Mr. Reeder, and his technical adviser, Mr. Rossi. On September 24, after again discussing this problem, Dotson requested that Rossi come to plaintiff's plant for further consultation regarding the matter of the troublesome seam. It was agreed by both parties that such a trip would be advisable. In that same telephone conversation, the suggestion was made that plaintiff should experiment in the factory by trimming off the surplus material or "step", either in the cutting room or sewing room to determine whether the elimination of the step would solve the problem of hydrostatic test failures. Plaintiff was advised on that occasion to go ahead and experiment to see what it "could come up with." Plaintiff subsequently experimented by

2. This testimony as to standard practice in the art was not contradicted.

3. Since the seam around the top half of the armhole extended beyond the seam around the bottom half, it was referred to by the witnesses before the Board as a "step" or "lug."

cutting the surplus off 1,500 coats in the cutting room and trimming approximately 2 to 3,000 coats in the sewing room.

On October 8, 1963 a Government quality control representative, Mr. Cozzi, made a routine and unsolicited visit to plaintiff's plant and observed the cutting and trimming operations with which plaintiff was experimenting. Cozzi stated that such operations were unauthorized and told plaintiff to stop cutting and trimming. Plaintiff's president, Mr. Hays, told Cozzi of the seam-sealing problems it was having and that the deviation had been discussed with the contracting officer. The next day Dotson called the contracting officer and his technical adviser to report Cozzi's visit. Dotson was advised to keep experimenting in the sewing room, but to stop cutting in the cutting room.

On October 21, Rossi, as previously arranged, visited plaintiff's plant and observed the contractor's manufacturing processes, including the armhole-trimming operation. Rossi asked Dotson whether the armhole leakage problem was solved, and was told that additional lots submitted to the Government, where the step (surplus material) had been trimmed off in the sewing room, had passed the Government's hydrostatic tests. After checking the hydrostatic test results of coats where the step was trimmed off and after consultation with plaintiff's president, Mr. Hays, Rossi advised the contractor to continue trimming off the steps in the sewing room. Rossi and Dotson also discussed the necessity for a change order and compensation for the additional trimming operation which was the apparent solution to the problem.

After October 21, 1963, plaintiff at least twice brought up the matter of the promised change order for the trimming operation to the contracting officer, Reeder, who took no action on the requests. The formal request for a change was not made until October of 1964, after both contracts had been completed. It was denied by a different contracting officer, and plaintiff subsequently took an appeal to the ASBCA which also denied the claim.

The second contract (No. 3384) referred to above, was awarded to plaintiff as of October 31, 1963. It provided for delivery of 102,320 raincoats identical to the ones being manufactured under the first contract. There were minor adjustments in unit price, although plaintiff's bid did not contain an allowance for the cost of the additional trimming operation. The bids on Contract No. 3384 were required to be in by October 9. Plaintiff's claim for an equitable change to compensate for the additional operation under this second contract was also denied by the Board.

Plaintiff then brought suit in this court, and averred in its petition that the decisions of the Board (ASBCA) are not supported by substantial evidence. We agree with plaintiff.

The Board's decision regarding Contract No. 2787 held essentially two things:

First, that the sleeve-setting and seam-sealing operations required by the specifications were not, as a practical matter, impossible of performance.

Second, that plaintiff was not ordered by the contracting officer or his representative to perform the extra-contractual trimming operation.

We think that the Board was wrong on both counts. This conclusion is made with due regard to the strictures of the Wunderlich Act for review by the court.

I

██ With regard to the first issue, we think the Board took too narrow a view of what constitutes defective specifications. This is not a case of strict impossibility, as the Board assumed. Given the circumstances of this case, the correct standard should have been that if the Government-supplied patterns and specifications are complied with, "satisfactory performance will result." J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 241, 171 Ct.Cl. 70, 76

(1965), citing, United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). This rule applies where, as in the instant case, the Government sees fit to prescribe detailed specifications. Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966); J. D. Hedin Constr. Co., supra; R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953).

The contract in the instant case contained patterns and specifications which dictated the exact measurements to be used in constructing the sleeve-armhole seam in dispute. The specifications required that the "width of the seam shall be ⅜ inch at top side of armhole" and that the "raised stitch around top side of armhole shall be ⅛ inch from edge." Given these precise measurements, the constructed seam necessarily had ¼ inch of surplus material, i. e., the raw edges extended ¼ inch from the raised stitching around the top half of the armhole. The pattern also required a certain fullness in the sleeve, which exacerbated the problem caused by the surplus material.

■ It should be noted that this is not a case where the contractor *unilaterally* chooses a method of production which is the cheapest or most efficient method and then is disappointed because the specifications do not allow for the utilization of the best method of operation from the contractor's viewpoint. As we pointed out in Natus Corp. v. United States, 371 F.2d 450, 458, 178 Ct.Cl. 1, 13, (1967), "the Government does not guarantee the contractor's profit." Here plaintiff was *required* to construct a raincoat with a defective armhole seam by virtue of Government-supplied patterns and specifications.

The question, then, is whether compliance with these detailed specifications would result in satisfactory performance. The Board has found that satisfactory performance was possible, in fact, accomplished in light of the fact that plaintiff's Lot 1 (1,280 raincoats) passed the Government's hydrostatic tests and was accepted.

The Board's finding that satisfactory performance was possible must be rejected as not supported by substantial evidence and resting on a misinterpretation of the contract. To the contrary, the evidence conclusively demonstrates that the patterns and specifications provided by the Government, i. e., requiring a seam with ¼ inch of surplus material, would not provide a satisfactory and workmanlike product.

One of the errors made by the Board in reaching its determination is based on a misinterpretation of the contract. The Board concluded that the contract required an indefinite number of coats of sealant to be applied to the seams, i. e., "as many as necessary", not considering as relevant whether four, fourteen or forty coats were necessary. The Board's interpretation is based on a literal reading of the contract.[4] It is obvious, however, that neither party construed the contract to require a limitless number of coats of sealant.[5] The undisputed testimony before the Board by both parties was to the effect that the standard trade practice was to apply approximately four coats of sealant. In other words, previous experience in the industry had defined "sufficient number" of coats of sealant as four or thereabouts. Although this fact was emphasized and reiterated during the course of the hearings, de-

---

4. "The seams shall be sealed with a sufficient number of coats of seam sealant and dusted in such a manner that the finished raincoat meets the hydrostatic and blocking requirements * * * when tested as specified." [Par. 3.3.4.1]

5. While it is admitted that under the contract more than four coats of sealant might be appropriate on occasional individual raincoats, this provision did not require, nor was it intended to require, a limitless number of coats of sealant when the sealing difficulties are caused by defects in *other* specifications. It was not intended to be a general cure-all for any other problem that might arise. This is especially true here, where more than 50 percent of the raincoats were unacceptable because of the excess material around the top half of the armhole seam.

fendant did not consistently deny the relevancy of this fact, as it would and should have, if the contract provision was indeed intended to diverge from standard practice, and require as many coats of sealant as necessary to pass the hydrostatic tests. In addition, the Government implicitly conceded this point at oral argument by arguing that four coats of sealant would have been sufficient *under these particular specifications;* but that the failures were due to contractor's sloppy workmanship.

■ Even more relevant to a proper interpretation of this provision is the fact that neither plaintiff nor defendant considered the application of additional coats as the required answer to plaintiff's difficulties at the actual time the contract was being performed. If the parties' interpretation of this provision were the same as the Board's interpretation, the Government would have simply, and rightfully, directed the contractor to apply as many coats of sealant as necessary to pass the hydrostatic tests. Yet this was not done. Instead, both parties thought it necessary to experiment with the seam width in the cutting and sewing rooms.[6] Since the parties acted as they did, and since "great weight is given to the practical interpretation of a contract by the parties to it before the contract becomes the subject of controversy," (Maxwell Dynamometer Co. v. United States, Ct.Cl., 386 F.2d 855, decided November 9, 1967) the Board's interpretation must be rejected as erroneous. Plaintiff had the right to assume that the coats, if made according to the Government-supplied specifications, could be properly sealed according to the standards of practice in the industry, and this means four coats of sealant or thereabouts.

With this proper interpretation in mind, it is next necessary to analyze the prime consideration which led· the Board to conclude that performance was possible, viz., that plaintiff's Lot 1 passed the Government's hydrostatic tests and was accepted without the surplus material being trimmmed off.

The undisputed testimony before the Board was that the coats in Lot 1, when sealed with the usual number of coats of sealant did *not* pass the contractor's own hydrostatic tests. It was only *after* the contractor subjected the coats to sometimes four or as many as eight additional coats that the raincoats were re-submitted and accepted by the Government. As we have stated above, the contractor was not obliged to apply a limitless number of coats or sealant. The Board's argument that perhaps only one or two additional coats of sealant would have been sufficient in many instances is difficult to accept because the undisputed fact is that some coats required as many as twelve coats of sealant. Since it is impossible to determine visually which of the raincoats needed only a few additional coats and which needed twelve coats of sealant, it was necessary to treat all the coats within the base for the random sample to as many coats as the one tested required. This is exactly the procedure followed by plaintiff, and criticized by the Board. The only other possibility would have been to pre-test every single coat before it was submitted to the Government. This must certainly be considered an unreasonable burden and one which neither party expected.

Another undisputed fact which tends to demonstrate the lack of substantiality of the. Board's conclusion is that Lot 2, which was constructed exactly according to the specifications (with the $\frac{1}{4}$ inch surplus) and treated to the standard four coats of sealant, did *not* pass the Government's hydrostatic tests, and consequently was rejected.

■ The Board has stated that the reason for the failure of Lot 2 is not because of the surplus material, but because of poor workmanship on the part of plaintiff's employees. The most that can be said for this finding is that there

---

**6.** See for example, technical adviser Rossi's conclusion in his written report that "the trimming operation was necessary."

are isolated bits of evidence which when viewed in isolation, do seem to support it. But we find that there is not substantial evidence on the whole record to support it, and this is the standard set by the Wunderlich Act, and which we must adhere to.

There are some statements in the record to the effect that plaintiff's employees were applying the sealant improperly, not distributing the fullness of the sleeve properly, and not mixing the sealant properly. Admittedly this may have had some effect on plaintiff's difficulties. However, the evidence indicates conclusively that the surplus material, which resulted from following the Government-supplied patterns and specifications, was the real culprit causing plaintiff's sealing difficulties.[7]

The fact that supports our conclusion most forcefully is a simple comparison. The first 3,300 coats were constructed with the surplus material on the sleeve-armhole seam, and plaintiff encountered the difficulties described above. By contrast, the remaining 156,000 coats supplied to the Government were constructed with the surplus material trimmed off and every lot save one passed the Government's hydrostatic tests. This is more than coincidence. The most skeptical empiricist would deduce that there is a causal relationship between the existence of the surplus material and the hydrostatic test failures. Yet there is more evidence, both factual and testimonial, supporting this relationship.

There was uncontradicted testimony by Mr. Dotson that the leakage occurred at the top half of the armhole, and not the bottom half. It will be remembered that the ¼ inch surplus material or step was only around the top half of the armhole, and not the bottom half. Again, the relationship between the surplus material and the leakage is impossible to ignore.

In addition, Mr. Rossi, in his report written after visiting plaintiff's plant and studying plaintiff's hydrostatic test results, concluded that "the trimming operation is *necessary*." [Emphasis supplied.] Mr. Levearl Hayes, the quality control representative permanently based at plaintiff's plant, also made a written report as a consequence of Mr. Rossi's visit, and he stated that "the net results of removing the step [surplus material] has been that the contractor has had no more failures for the hydrostatic test in the Laboratory Division."

An additional fact which supports this conclusion, although we do not rely on it, is that the Government later changed the specifications on all subsequent contracts regarding this type of raincoat to *require* the trimming operation.

II

The second error by the Board involves its conclusion that the additional operation was not performed by virtue of any Government "order"; consequently plaintiff was acting as a mere volunteer. This conclusion is not based on substantial evidence nor upon a proper interpretation of the law.

■ In the first instance, it is well settled that the absence of a written change order does not bar recovery when both the contracting officer and ASBCA considered the merits of the claim. See, Kings Electronics Co. v. United States, 341 F.2d 632, 639, 169 Ct.Cl. 433, 443 (fn. 15) (1965); Fox Valley Engineering, Inc. v. United States, 151 Ct.Cl. 228, 237 (1960). In the instant case, plaintiff's claim was considered on the merits by the Board, even though the change order was not written, but oral, and so it must be considered here on the merits.

The next question is whether the change order must be given by the contracting officer himself or whether that

---

7. As mentioned earlier, many of the minor defects (relied on by the Board) pointed out to plaintiff by technical adviser Rossi were corrected, and still the sealing difficulties continued unabated. What little relationship there was between the minor defects and the sealing difficulties, if any, cannot be supported by anything more than speculation, especially in view of the evidence showing the causal effect of the surplus material.

authority can be delegated. Although it is conceded here that Reeder himself did not order the additional operation, his technical adviser, Charles Rossi, directed the performance of the additional operation by authority of, and with knowledge of the contracting officer.

■■ The Board has not stated that the contracting officer can never delegate his authority, since it is well known that he can so delegate. See, e. g., *Fox Valley Engineering, Inc.*, supra, at 238–240. Instead, the Board has found that Rossi was a mere "technical" representative acting in a "noncontractual capacity." This characterization of Rossi's function is not supported by substantial evidence on the whole record.

The plain undisputed fact is that Rossi was sent to plaintiff's plant in Alabama by the contracting officer for the sole purpose of settling the problem involving the surplus material and hydrostatic test failures. An integral part of this function is that of giving guidance and any necessary instructions to the contractor. If Rossi were not sent to Alabama for this purpose, then his visit loses all significance. In fact, Rossi was successful, and did find the solution to the problem, and instructed the contractor to adopt the solution. Liability for the actions of a Government agent, who carried out exactly what he was ordered to do, cannot be avoided by pointing to labels. The appellation, "technical adviser", does not detract from Rossi's *actual* function. It is to the actuality that we must look.

It is also incongruous to say that Rossi did not have the authority to direct a change while he was at plaintiff's plant, yet did have authority when he returned to Philadelphia. Cf., *Fox Valley Engineering, Inc.*, supra, at 240. Yet this is, in effect, the Board's position. From the testimony before the Board, it is clear that Reeder himself would not make such a decision, but would rely on Rossi, because of the technical nature of the decision. (Transcript at pp. 155–156):

Q. And you didn't have any details as to what the nature of the operation [trimming operation] was or the additional costs involved in these conversations?

A. (Mr. Reeder): I normally don't dig into that area. I depend on technical advice for this kind of thing * *. Since Rossi would, in effect, be making the decision as to whether to perform the additional operation, it does not matter whether he made it in Alabama or Philadelphia.

It is also undisputed that Rossi himself understood the effective division of authority between himself and the contracting officer vis-a-vis technical matters. [Transcript at p. 127]:

Q. Now, Mr. Rossi, you have been in this business, a long time, have you not, and do you have to be a lawyer to know, if you instructed a contractor to perform additional operation, he would be entitled to additional costs?

A. (Rossi): *This is true*, but I didn't instruct him to perform an additional operation. [Emphasis supplied]

Although Rossi admitted he could instruct a contractor to perform additional operations, he later attempted to negate this testimony by stating that he did not really have authority to instruct contractors or "to give his [contracting officer's] money away". [Tr. at p. 127] It is obvious, however, that the qualification Rossi was attempting to articulate was that *ultimate* authority probably rested in the contracting officer. He was, in effect, saying that Reeder could always overrule his (Rossi's) judgment. Assuming *arguendo* this is true, the facts and conclusions in this case remain unchanged since the threshold decision to direct the additional operation was made by Rossi and acquiesced in by Reeder. It is undisputed that the reports of Rossi and Levearl Hayes, both of which refer to the promised change order, were sent to Reeder. *He chose not to exercise his ultimate authority, and so ratified Rossi's decision.*

■ The only real question then is whether Rossi instructed plaintiff to

perform the additional operation. The Board's finding in the negative to this question is not supported by substantial evidence.

The only supportable conclusion that can be drawn from the evidence is that Rossi, on the occasion of his visit to plaintiff's plant, instructed plaintiff to stop experimenting in other areas, but to continue trimming the "step" in the sewing room on all future lots of raincoats. The matter of a suitable change order and additional compensation was also discussed at that time.

Although Rossi's visit to plaintiff's plant is the critical event in our minds, it should not be viewed in isolation, but as part of the totality of events and communications between plaintiff and defendant leading up to and including October 21.

Although there is some conflicting testimony by Rossi as to what transpired during his visit to plaintiff's plant, the above-recited version is verified by a three-page written report prepared by Rossi himself immediately after his visit, and before the beginning of any litigation. The report, dated November 1, 1963, noted that the step trimming operation was "substantially in line with the procedure suggested by the writer [Rossi] to the contractor in several telephone conversations previous to the visit to the plant concerning the problem". The report went on to conclude:

> There was not much that could be added to the *instruction* that had already been given by the writer to the contractor in previous telephonic conversations. These *instructions* seem to have born [sic] fruit * * *.
>
> \* \* \* \* \* \*
>
> *The trimming operation is necessary and contractor will be intitled [sic] to a monetary adjustment if he makes a claim.* [Report at pp. 1, 3] [Emphasis supplied]

Mr. Levearl Hayes, the Government quality control representative based at plaintiff's plant in 1963, accompanied Rossi and Dotson during the former's visit to plaintiff's plant. Hayes also wrote a report, dated October 28, which is in substantial compliance with Dotson's testimony before the Board and Rossi's contemporaneous written report. Hayes' report stated *inter alia:*

1. *The Contracting Officer* [and] *Quality Specialist* [*Rossi*] assigned to this contract *requested* the contractor to experiment and determine a method to join the armhole that would give the best hydrostatic results. * * * The net results of removing the step has been the contractor has had no more failures for the hydrostatic test in the Lab. Div. In addition the appearance of the sleeve in my opinion has improved.

2. * * * *The request* to remove the step *by the Contracting Officer and Quality Specialist* made the applicable Commodity Division aware of the removal of the step. I had no reason to question their doing this for there was reason to remove the step to make the hydrostatic testing better.

3. * * * The Contractor has now agreed with Q C Specialist Charles Rossi on his visit to the plant to remove the step by adding an operation in the sewing room.

\* \* \* \* \* \*

6. On 21–22 Oct. 63 this plant was visited by Mr. Charles Rossi, Q C Spec. *The removal of the step was settled and a change order will be issued to correct the deviation* mentioned in Mr. Cozzi's report. [Emphasis supplied]

On the basis of the oral testimony and these reports it is conclusively demonstrated that Rossi instructed plaintiff to trim the step on all future lots of raincoats.

It is also untenable to argue that plaintiff was performing this additional operation for its own benefit, because the contractor was sure, at least in its own mind, that the fault was with the specifications in providing too wide an armhole seam. This view was concurred in by Rossi, in that he, too, thought the seam

was too wide, and that the trimming operation was "necessary."

It is not necessary to discuss the Board's contention that any change order promised by Rossi may well be a "no-cost" change order, since Rossi's report concluded that the contractor would be entitled to a "monetary" adjustment.

For these reasons we find as a matter of law that Rossi did instruct plaintiff to perform the additional trimming operation with the acquiescence and ratification of Reeder, the contracting officer. Cf., W. H. Armstrong & Co. v. United States, 98 Ct.Cl. 519 (1943).

 The only remaining question involves plaintiff's claim for compensation for the additional trimming operation under the second contract (No. 3384). The Board held with reference to this contract that plaintiff's claim must be rejected "because at the time of appellant's amended bid, it knew that in the first contract it had under-estimated the cost of the armhole seam sealing process or had to add the cost of the added trimming operation. It was charged with notice of these matters in preparing its bid for Contract No. 3384 * * *, and cannot by this route correct its deficient bid." (ASBCA Opinion at p. 10).

This argument, too, must be rejected. Although plaintiff here is attempting to correct a deficient bid, it is not the situation where plaintiff had all the appropriate considerations at its disposal at the time of bidding, as the Board presumed. Closing time for bidding on the second contract was October 9. At this point in time, plaintiff only knew that there were sealing difficulties with the armhole seam; it had no way of knowing what the solution would be. Certainly we cannot charge plaintiff with constructive notice of a fact not yet established. Since plaintiff was not in a position to make a rational adjustment of its bid, it cannot be barred from recovery.

For all of the above reasons, the court concludes as a matter of law that plaintiff is entitled to recover for the additional trimming operation the stipulated

amounts of $3,644.68 under Contract No. 2787, and $5,690.40 under Contract No. 3384. Judgment is entered to that effect.

SKELTON, Judge, concurring:

I agree with the results reached in the opinion written by Judge Durfee, but I would arrive at the decision in a somewhat different manner as to some aspects of the case.

It appears to me to be unnecessary to hold that the decisions of the Armed Services Board of Contract Appeals (ASBCA or Board) are not supported by substantial evidence. The evidence was disputed, and this puts the court in the position of having to distinguish between what is substantial evidence and what is not. Sometimes this can be a difficult question to determine. I believe we do not have to decide it here.

The evidence in this case is of such a nature that as a matter of law the Board could have made only one finding of fact on the controlling issue in the case, namely if the detailed patterns and specifications furnished by the government had been complied with by the contractor, as it reasonably interpreted them and as requiring four coats of sealants on the armhole seams, satisfactory performance would not have been possible. See Maxwell Dynamometer Co. v. United States, Ct.Cl., 386 F.2d 855 decided November 9, 1967. Since this question of fact is to be determined as a matter of law, the court can make this finding without sending the case back to the Board.

The specifications and patterns furnished by the government were defective and if followed by the contractor and with four coats of sealants on the armholes (which was recognized as being the correct number in the trade), the raincoats would not have passed the test. This was true with respect to the coats in Lot 1. It was only after four to eight additional coats of sealant were applied that they passed. The coats in Lot 2 were constructed strictly in accordance with the specifications (with the ¼ inch surplus material on the armhole seams)

and with four coats of sealant failed to pass.

Other circumstances show that the specifications were defective. When the surplus material was trimmed from the armhole seams and four coats of sealant were applied, the coats passed. Also, the Board inferentially recognized that they were defective in rendering its decision on the second contract when it stated that the contractor in making its bid knew that it had underestimated the cost of the armhole seam sealing process *"or had to add the cost of the added trimming operation."* (Emphasis supplied.) This shows that the Board thought the specifications in both contracts were defective. Also, while not controlling, it is shown that the government later changed the specifications regarding this type of coat so as to require the surplus material to be trimmed from the armhole seams.

The parties themselves showed by their acts and conduct before any controversy arose that the specifications and patterns were defective. The facts conclusively show that if they were followed, the coats would not pass the test.

Accordingly, I would hold as a matter of law that the contractor's interpretation of the contracts and of the trade practice as to sealants was reasonable and binding on defendant, and that the specifications were factually impossible to comply with if the coats were to pass the tests. See Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966); Maxwell Dynamometer Co. v. United States, supra.

The plaintiff is entitled to recover the costs incident to its attempts to comply with these defective specifications in the stipulated amounts of $3,644.68 and $5,690.40.

DAVIS, Judge (dissenting):

I see the record quite differently. The vital findings of the ASBCA seem to me well supported by substantial evidence on the record as a whole. I select for discussion two dispositive Board conclusions of fact which the court overturns—improperly, in my view. One is the finding that Rossi, the technical adviser or specialist, never gave an order to the plaintiff to trim the "step". The Board declared, and the court does not disagree, that if such an order was given it must have been on Rossi's visit to the plant on October 21, 1963. The Board then goes on to find that no such order was given. This was, in large part, an issue of conflicting testimony. The company's witnesses said that they had been so instructed. Rossi denied this on the stand, saying unequivocally (both on direct and on cross-examination) that he never instructed the contractor to remove the "step" in the sewing room and never told them they would be entitled to additional payment. The Board obviously thought this testimony more credible, for one reason, because "at the time of that visit appellant [plaintiff] had been performing this operation on its own initiative for about three weeks and had continued to do so, although the Quality Control Representative [Mr. Cozzi] who visited its plant on 8 October 1963, had objected thereto; indeed appellant telephoned the contracting officer at that time to obtain his permission to continue this additional operation." The reports made after Mr. Rossi's visit can be read (as the court does) as suggesting, on the other hand, that an order was in fact given, but this reading is disputable and, in any event, it is the Board's function not the court's—especially where there is conflicting testimony—to evaluate all the factors tending one way or the other. It is a rare case indeed that we could upset an administrative finding based on explicit oral testimony such as Rossi's. "Substantial evidence is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)." Illinois Central R. R. v. Norfolk & Western Ry., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed. 2d 162 (1966).

The other dispositive finding relates to faults in plaintiff's manufacturing and testing processes which, the Board found, were more probably the cause of the failure of its second lot to pass the hydrostatic tests. The Board noted that (i) Mr. Cozzi, the Government's quality control representative, observed a failure by the contractor's workers to distribute the sleeve fullness properly so that the armhole became puckered and twisted; (ii) Mr. Rossi's testimony and written report noted that some of the differences as to test results may have stemmed from the fact that plaintiff tested uncompleted coats and that the sealant may not have had proper consistency; and (iii) most significantly, the second lot failed the defendant's tests not only because of leakage at the armhole seam but also at the side seam. Since no "step" was involved in the side seam, the Board thought that it could only attribute the leak at that point "to insufficient sealing either in material quality or in the care with which the sealant was applied." The Board added that even after the company "engaged in the described trimming operation, it was still possible to have leakage from unskillful or inadequate application of sealant to the armhole seam, as appellant proved by the failure of the hydrostatic tests of lot 17 under Contract No. 2787."

The court gives three main grounds for rejecting the Board's findings: The many coats with the "step" trimmed off passed the tests (except for the one lot) while the earlier coats bearing the surplus material failed; the leakage occurred at the top half of the armhole (where the "step" is located), not the bottom half; and statements in the reports of Government representatives to the effect that the trimming operation was "necessary." [1] These are certainly reasons which could persuade a factfinder, but they are not conclusive. After all, one later lot (No. 17) did fail even after the trimming off of the "step", and the side-seam leaked even though no "step" was involved. The Board could find that these failures were caused by faulty workmanship (including insufficient sealing) and that this same neglect, rather than the "step", caused the leakage on the early tests.[2] The plaintiff's care would probably be greater after it experienced its troubles, and after the rejection of the second lot, and that is why, the Board could decide, the contractor's experience was better with the later inspections. The improved results after the removal of the "step" could, indeed, have been coincidental to that operation; *post hoc* is not always *propter hoc*. Reasonable inferences of this type are for the administrative tribunal, not for us, to evaluate and make. Federal Trade Comm'n v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534 (1927); Illinois Central R. R. v. Norfolk & Western Ry., supra. The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). In particular, it is not the rule that a board finding can stand only if the court agrees with it or cannot easily make up its mind, or where the evidence is very closely bal-

---

1. In his oral testimony, Rossi testified that the trimming operation may have been necessary to this particular contractor, because of the way it operated, but would not be necessary for others doing the same type of work if they applied the sealant properly. Rossi emphasized that plaintiff was making the top armhole seam too wide, and that this caused the "step"; in his opinion the "step" was a necessary result of the contractor's less-than-adequate manufacturing methods.

2. The plurality says, in a footnote, that many of the minor defects in plaintiff's workmanship were corrected and still the sealing difficulties continued unabated. The Board did not make any such finding that the defects to which it referred were corrected before the second batch of garments was rejected, and the record does not compel that conclusion, and may not even permit it.

anced. Just as with jury verdicts, board findings which affirmatively appear to us to be incorrect or questionable are often sustained by "substantial evidence" on the record as a whole, and must therefore be left undisturbed.

In this connection it is important to note that the evidence as to trade practice shows, not that four coats was always the rigid upper limit, but that four or five would be usual, and sometimes six. The Board criticized the contractor for jumping (in multiples of four) from four to eight to twelve coats, saying that perhaps only one or two additional coats would have been sufficient. The court, in turn, criticizes the Board because "*some* coats required as many as twelve coats of sealant" and "it is impossible to determine visually which of the raincoats needed only a few additional coats and which needed twelve coats of sealant" (emphasis added). What the court overlooks is that the Board could reasonably find that in the relatively few instances in which twelve coats were needed (before the item passed the early tests) the extra coats, above 5 or 6, could have been due to plaintiff's fault in mixing or applying the sealant, not to the existence of the "step". If the contractor's neglect caused that many applications of sealant to be needed in some cases, the defendant cannot be held responsible for plaintiff's decision to increase the sealant-coats in multiples of four for all the garments.

The sum of it is that, if this were a jury trial, I could not set aside a verdict for the Government on this record. The same test applies here, as the Supreme Court has reiterated. I must therefore accept the Board's two dispositive findings that no order was given to plaintiff and that its difficulties were caused by its own insufficiencies. Either of these findings is enough to conclude the case against plaintiff.

I add that I agree with the court as to the rule for defective Government-supplied specifications, but think that the Board applied the same rule in substance, though it used different words. I agree also with the court (and disagree with the Board) that the contract called upon the contractor to apply only the number of coats of sealant required by the standard trade practice. However, this legal error of the Board in interpreting the agreement was immaterial to its dispositive factual findings which I believe we must accept.

NICHOLS, Judge, joins in the foregoing dissenting opinion.